ARBITRIUM (CAYMAN ISLANDS) HANDELS AG and Miklos Vendel, Plaintiffs,

v.

H. Frederick JOHNSTON, Sandra Spillane and Technicorp International II, Inc., Defendants.

Civil Action No. 13506.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 11, 1997.
Decided: May 27, 1997.

---

Thomas J. Allingham II, Cathy L. Reese, and Thomas G. Macauley, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, for Plaintiffs.

David A. Jenkins, of Smith, Katzenstein & Furlow, Wilmington; Allan M. Pepper, of Kaye, Scholer, Fireman, Hays & Handler, New York City; Jeffrey H. Daichman, of Kane Kessler, P.C., New York City, for Defendants.

## OPINION

JACOBS, Vice Chancellor.

Pending is an application for attorneys' fees by plaintiffs Miklos Vendel ("Vendel") and his corporate nominee, Arbitrium (Cayman Island) Handels AG ("Arbitrium"). Vendel incurred those fees in successfully prosecuting this action brought under 8 *Del. C.* § 225 for a judgment declaring that (i) he is the majority shareholder of Technicorp

International II, Inc., a Delaware corporation, ("TCI II"), and that (i) the defendants, H. Frederick Johnston ("Johnston") and Sandra Spillane ("Spillane"), were validly removed as TCI II's officers and directors. During the two years required to litigate this acrimonious litigation, the plaintiffs were constantly confronted with bad faith litigation tactics by defendants in their effort to obstruct the exercise of Vendel's right as majority shareholder to assume control of the corporation. For the reasons discussed below, the Court finds that the defendants' conduct both before and during the litigation was sufficiently egregious to justify an award against them of the plaintiffs' reasonable attorneys' and expert witness fees.

## I. *FACTS*

The facts recited herein are either undisputed or were formally adjudicated in this Court's earlier Opinions in this action.[1]

In 1984 Johnston and Vendel agreed jointly to purchase Statek, a California-based manufacturer of micro-electronic components. TCI II was formed as the acquisition vehicle. After the purchase, Statek was at all times operated as a wholly-owned subsidiary of TCI II. Johnston served as TCI II's Chairman, President and Treasurer, while Spillane, Johnston's long time business associate, served as TCI II's Vice President, Secretary and a director. At all pertinent times, TCI II was operated solely and exclusively by Johnston and Spillane, with no participation by or input from Vendel.

During the next six years, Vendel received almost no financial information about his investment in TCI II. Moreover, the defendants concealed material information from

Vendel, namely: (1) a 1985 charter amendment—adopted without Vendel's knowledge or approval—purporting to convert his voting stock to non-voting stock; (2) a 1992 charter amendment—also not known or approved by Vendel—that purported to triple TCI II's outstanding shares;[2] (3) payments (recorded on TCI II's books as undocumented, interest free "loans") totalling almost $6 million, that Johnston and Spillane caused TCI II and Statek to make to themselves between 1984 and 1992; and (4) Johnston's failure to pay his agreed-to share of equity capital.[3] Johnston actively misled Vendel to believe that he (Johnston) had paid his share and was TCI II's majority shareholder.

In October 1990, after repeated requests, the defendants furnished Vendel with a stock certificate reciting that Vendel held 82,250 non-voting shares in TCI II. Vendel protested, demanding that Johnston explain why the certificate reflected only 82,250 shares and why those shares were non-voting, rather than voting. Nine months later, again after repeated requests for information, Vendel received a TCI II balance sheet, to which he objected. The defendants later conceded that that balance sheet was erroneous.

In August 1991, after receiving a copy of the TCI II 1985 charter amendment that would have disenfranchised him, Vendel again protested and requested supporting documentation. In response, the defendants' New York attorney, Samuel Greenspoon, represented to Vendel in July, 1992, that no such documentation existed to his knowledge.[4] Vendel then commenced a "books and records" action in this Court under 8

---

1. The previous opinions in this action are referred to herein as follows: *Arbitrium (Cayman Islands) Handels AG, et al. v. Johnston, et al.,* Del. Ch., C.A. No. 13506, Jacobs V.C., 1996 WL 12149 (January 5, 1996) (referred to as "Op. 1/5/96"); *Arbitrium (Cayman Islands) Handels AG, et al. v. Johnston, et al.,* Del. Ch., Del. Ch., C.A. No. 13506, Jacobs V.C., 1995 WL 606310 (Oct. 6, 1995) (referred to as "Ltr. Op. 10/6/95"); *Arbitrium (Cayman Islands) Handels AG, et al. v. Johnston, et al.,* Del. Ch., C.A. No. 13506, Jacobs V.C. (November 21, 1994) (referred to as "Ltr. Op. 11/21/94"); *Arbitrium (Cayman Islands) Handels AG, et al. v. Johnston, et al.,* Del. Ch., C.A. No.13506, Jacobs V.C. (October 19, 1994)

(referred to as "Ltr. Op. 10/19/94"); *Arbitrium (Cayman Islands) Handels AG, et al. v. Johnston, et al.,* Del. Ch., C.A. No. 13506, Jacobs V.C., 1994 WL 586828 (Sept. 23, 1994) (referred to as "Ltr. Op. 9/23/94").

2. The newly authorized shares were thereafter issued to Johnston for the nominal amount of $1 per share.

3. Op. 1/5/96, at 33.

4. PX 47.

*Del. C. §* 220.[5] The defendants contested the § 220 books and records inspection claim, on the ground that Vendel had an ulterior, improper motive.[6] Vendel requested expedited proceedings, which the defendants opposed on the basis that Vendel had unduly delayed in bringing the action. The Court rejected that argument and expedited the proceeding.

In the § 220 action, the defendants also raised as an issue whether Arbitrium, the corporate entity through which Vendel held his TCI II stock, was a legitimate nominee. This Court denied the defendants' request for an additional deposition and to postpone the trial.

After discovery, the § 220 action was settled and Vendel was given certain documents, including the information that Mr. Greenspoon had previously represented did not exist. From those documents Vendel concluded that he was—and all along had been—TCI II's majority shareholder. Accordingly, Vendel executed a written consent removing Johnston and Spillane as directors of TCI II, which Johnston and Spillane refused to honor. As a consequence, Vendel was forced to bring this action under 8 *Del. C. §* 225 for a determination that he, as TCI II's majority stockholder, had validly removed the defendants as directors and officers of TCI II. Plaintiffs then moved for expedited proceedings, which the defendants opposed.[7]

Shortly thereafter, the parties entered into a Standstill Agreement wherein defendants agreed that:

[P]ending a decision by the Chancery Court in this § 225 action, TCI–II will not make any loans or other extraordinary cash disbursements to Johnston, Spillane or to, entities affiliated with, or owned or controlled by Johnston or Spillane nor will TCI–II or Statek engage in any extraordinary transactions without first giving plaintiffs seven (7) days written notice.[8]

Discovery proceedings were at all times acrimonious and hotly contested. The plaintiffs ultimately filed two separate motions to compel in May and July 1994, and the defendants filed a motion to compel the deposition of Arbitrium for the stated purpose of exploring the relationship between Arbitrium and Vendel. After Arbitrium's chairman testified in his deposition that the nominee relationship between Vendel and Arbitrium was being administered by a Swiss law firm, the defendants requested the Court to issue letters rogatory to depose one of that law firm's principals. That motion was granted over plaintiffs' opposition.[9]

Thereafter, the defendants repudiated the Standstill Agreement, which plaintiffs then moved to enforce. Defendants opposed the motion, arguing that upon entering into that Agreement they expected a prompt resolution of the merits, but because the pretrial motions and postponements of the trial made that highly unlikely, the defendants considered themselves no longer contractually bound. The Court found that that position had "no basis in law" and was "entirely without factual support."[10]

The defendants then moved to postpone the trial, which was scheduled to begin in less than two weeks. The Court denied that motion.[11]

The trial concluded on March 23, 1995. While the case was awaiting decision on the merits, the plaintiffs discovered that Johnston had awarded himself a $500,000 salary which (plaintiffs claimed) violated the Standstill Agreement. In contesting that claim, Johnston repudiated his earlier testimony

5. *Arbitrium (Cayman Islands) Handels AG v. Technicorp International I,* Del. Ch., C.A. No. 13240, Chandler, V.C. An Opinion issued in that action on February 4, 1994 is referred to as "Ltr. Op. 2/3/94."

6. *See* Ex. J. to Affidavit of Jeffrey H. Daichman (12/17/93), filed in *Arbitrium (Cayman Islands) Handels AG v. Technicorp International II,* C.A. No. 13240.

7. Defs. Opposition to Pits. Motion to Expedite, 5/13/94.

8. Ltr. Op. 9/23/94, at 3 (quoting 6/3/94 Letter from defendants' counsel to plaintiffs' counsel).

9. Ltr. Op. 11/21/94.

10. Ltr. Op. 9/23/94, at 6–7.

11. Ltr. Op. 10/19/94.

that he had never received any compensation from TCI II. Johnston now took the position that the salary was not "extraordinary," because Statek and TCI II had been paying Johnston annual compensation of over $500,000 for the past several years. The Court rejected that argument, holding that "under any view of the matter" defendants had violated the Standstill Agreement.[12] To remedy the violation, the Court ordered Johnston to return $775,000 to TCI II and directed that the Standstill Agreement be embodied in a formal Order of the Court.[13]

On January 6, 1996, this Court handed down its Opinion on the merits, validating Vendel's position that he was TCI II's majority shareholder, based upon the Court's findings that (i) the parties had agreed that their shareholdings would reflect their respective equity investments, and (ii) Vendel's investment constituted over 50% of the corporation's equity. Rejecting the defendants' contrary arguments, and most of the evidence adduced to support them, the Court found that the "defendants' demonstrated pattern of misleading this and other courts, and of deceiving Mr. Vendel and (it appears) governmental taxing authorities as well, strips them of any legitimate claim to credibility."[14] The Court also found, in that connection, that the most significant item of evidence supporting the defendants' claim—the so-called "alternative loan ledger"—had been manufactured for purposes of the trial and was therefore unworthy of credence.

The judgment of this Court was affirmed on appeal.[15] Thereafter, the plaintiffs moved for an award of the attorneys' and expert witness fees they incurred in successfully prosecuting this § 225 action and the earlier § 220 action.

## II. *THE CONTENTIONS*

The plaintiffs contend that this Court should require the defendants to pay their attorneys' fees [16] because (1) the defendants' bad faith opposition to this action and bad faith conduct during this litigation justifies a fee-shifting award, and (2) the defendants' underlying conduct upon which this litigation was based was so deplorable as to justify an equitable award of fees. More specifically, the plaintiffs argue that the defendants knew from the outset that Vendel (Arbitrium) was TCI II's majority shareholder, and that by forcing plaintiffs to file these actions, they acted in bad faith. Thereafter (plaintiffs claim) the defendants employed bad faith litigation tactics, including (a) willfully violating the Standstill Agreement, (b) repudiating their sworn testimony and fabricating evidence, and (c) purposefully delaying the proceedings.

The defendants vigorously oppose this fee application on various grounds, which the Court now addresses.

## III. *THE EFFECT OF TCI IT'S PARTIAL REIMBURSEMENT OF VENDEL'S ATTORNEYS' FEES*

Before it reaches the merits of the attorneys' fees claim, the Court first considers the defendants' argument that, because Vendel has been reimbursed a portion of his fees by TCI II, he may not pursue attorneys' fees to that extent, since any award would constitute a double recovery. I disagree. Vendel has represented to the Court that if he is awarded a fee, he will return to TCI II all moneys TCI II previously paid to him as partial reimbursement of his legal expenses.[17] Had the corporation never reimbursed him, Vendel would have the undisputed right to pursue his claim for attorneys' fees. Because Vendel is willing to be bound by an arrangement that eliminates any risk of double recovery, this ground for opposing

---

**12.** Ltr. Op. 10/6/95, at 5–6.

**13.** *Id.,* at 9.

**14.** Op. 1/6/96, at 30–31.

**15.** *Johnston, et al. v. Arbitrium (Cayman Islands) Handels AG, et al.,* Del.Supr., No. 60, 1996, 1996 WL 539819 (Sept. 17, 1996).

**16.** The plaintiffs also request an award of their expert witness fees and costs as the prevailing party in the litigation. *See infra* Part VII.

**17.** Aff. of Miklos Vendel, 12/16/96 at ¶ 9.

the fee application is obviated.[18]

## IV. *THE APPLICABLE STANDARD*

■ Although this Court has discretion to award attorneys' and expert witness fees,[19] under the "American Rule" courts do not award attorneys' fees to a prevailing party absent some special circumstance.[20] Those special circumstances which constitute exceptions to the American Rule are limited to: 1) cases where fees are authorized by statute, 2) cases where the applicant creates a common fund or non-monetary benefit for the benefit of others, 3) cases where the underlying (pre-litigation) conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages, and 4) cases where the court finds that the litigation was brought in bad faith or that a party's bad faith conduct increased the costs of litigation. (This fourth exception is referred to as the "bad faith exception").[21] The first two exceptions are not applicable here. Accordingly, the analysis centers upon the remaining two exceptions.

■ This Court has suggested that in certain egregious circumstances, a party's fraudulent behavior that underlies and forms the basis of the action may justify an award of attorneys' fees against that party.[22] The Court has recognized, however, that an award of attorneys' fees is "unusual relief," [23] and that "[t]he American Rule would be eviscerated if every decision holding defendants liable for fraud or the like also awarded attorney's fees." [24] For that reason this quite narrow exception is applied in only the most egregious instances of fraud or overreaching.

■ As a corollary to the exception allowing fee-shifting where an action is brought in bad faith, attorneys' fees have also been awarded where the defendant in bad faith has forced the plaintiff to bring the lawsuit to enforce a legal claim that the defendant knew was valid.[25] For a fee award to be granted in those circumstances, it is not enough that the defendant be adjudicated a wrongdoer; the defendant must also be found to have asserted his defense in bad faith.[26]

■ The bad faith exception is not limited to the circumstances where the action is brought in bad faith or where the defendants' bad faith forces the filing of the action. It also includes cases where the litigation process itself is conducted in bad faith.[27] In

---

**18.** Appropriate language formalizing Vendel's representation may be included in the Order implementing this Opinion.

**19.** *Barrows v. Bowen,* Del. Ch., C.A. No. 1454–S, Allen, C., 1994 WL 514868 (Sept. 7, 1994), at 1; 10 *Del. C.* § 5106.

**20.** *Barrows, supra* note 19, at 1; *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 248–50, 95 S.Ct. 1612, 1617–18, 44 L.Ed.2d 141 (1975).

**21.** *Barrows, supra* note 19, at 1–2.

**22.** *See Id.,* at 2; *Weinberger v. UOP, Inc.,* Del. Ch., 517 A.2d 653, 656 (1986); *Hutchinson v. Fish Engineering Corp.,* Del. Ch. 204 A.2d 752, 753 (1964), *aff'd,* Del.Supr., 213 A.2d 447 (1965).

**23.** *Weinberger v. UOP,* 517 A.2d at 656.

**24.** *Barrows, supra* note 19, at 3.

**25.** *See Abex, Inc. v. Koll Real Estate Group, Inc.,* Del. Ch., C.A. No. 13462, Jacobs, V.C., 1994 WL 728827 (Dec. 22, 1994); *see also Judge v. City of Rehoboth Beach,* Del. Ch., C.A. No. 1613, Chandler, V.C., 1994 WL 198700 (Apr. 29, 1994).

**26.** *See Weinberger v. UOP, Inc.,* Del. Ch., 517 A.2d 653 (1986) (denying attorneys' fees despite finding that defendant was "an adjudicated fiduciary wrongdoer"); *see also University of Delaware v. Warrington,* Del. Ch., C.A. No. 12440, Chandler, V.C., 1993 WL 410417 (Oct. 6, 1993).

**27.** *Roadway Exp., Inc. v. Piper,* 447 U.S. 752, 766, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980) ("bad faith may be found not only in the actions that led to the lawsuit, but also in the conduct of the litigation" (quoting *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973))); *Batson v. Neal Spelce Associates, Inc.,* 805 F.2d 546, 550 (5th Cir.1986) ("Court may also award fees ... as a sanction for bad faith in the conduct of the litigation resulting in an abuse of judicial process"); *Bower v. Weisman,* 674 F.Supp. 109, 112 (S.D.N.Y.1987) ("in the exercise of its inherent powers, a court may tax costs and attorneys fees against a party for bad faith actions taken in the conduct of litigation, even if the litigation itself is not in bad faith"); *see also Lipsig v. National Student Marketing Corp.,* 663 F.2d 178, 182 (D.C.Cir.1980) (finding as one basis for awarding attorneys' fees that party had at least twice "seriously misled the Court by misquoting or omitting material portions of documentary evidence"); *First National Bank in Sioux Falls v. Dunham,*

such cases, the fees typically awarded are the additional fees incurred as a result of the bad faith conduct.[28]

To award fees under the bad faith exception, the party against whom the fee award is sought must be found to have acted in *subjective* bad faith.[29] A finding of bad faith involves a higher or more stringent standard of proof, *i.e.,* "clear evidence".[30] Thus, bad faith has been found where the defendant admitted that he refused to honor plaintiff's valid contract claim for ulterior reasons unrelated to the merits of the claim (*see Abex v. Koll Real Estate Group, Inc., supra* note 25, at 20–21), and where the defendant had received several legal opinions that his position had no valid basis (*see Judge v. Rehoboth Beach, supra* note 25, at 4).

This fee application will be evaluated under these standards.

\* \* \* \* \* \*

In Part IV of this Opinion, the Court first addresses the plaintiffs' claim for an award of attorneys' fees they incurred in prosecuting their earlier § 220 proceeding. In Parts V and VI, the Court next considers the plaintiffs' claim for fees incurred in this § 225 proceeding, focusing first on the defendants' underlying fraudulent conduct, and then upon the defendants' opposition to this action and their conduct in defending this litigation. Ultimately the Court concludes that the clear evidence establishes that the defendants opposed this action in bad faith, and should be required to pay the plaintiffs' attorneys' fees. The Court further concludes that the defendants' bad faith conduct during the litigation is an additional, independent basis for an award of attorneys' fees under the bad faith exception. Finally, in Part VII the Court addresses the reasonableness of the attorneys' fees, and in Part VII, it considers the claim for expert witness fees.

## V. THE CLAIM FOR FEES INCURRED IN THE § 220 PROCEEDING

The plaintiffs first claim that the defendants, in bad faith, forced them to prosecute the § 220 action to enforce their legal right as a TCI II shareholder to relevant corporate information. As evidence of bad faith, the plaintiffs point to the Court's findings in this § 225 action that the defendants ignored Vendel's requests for information as part of a larger effort to conceal their improper prelitigation conduct, which was intended to advantage themselves at the expense of Vendel. That conduct included: (1) surreptitiously adopting the 1985 charter amendment that purported to convert Vendel's voting stock to non-voting stock; (2) surreptitiously adopting the 1992 charter amendment that purported to triple TCI II's outstanding shares (which shares were then immediately issued to Johnston for a nominal $1 per share); (3) payments between 1984 and 1992 of almost $6 million in undocumented, interest free "loans," that Johnston and Spillane caused TCI II and Statek to make to themselves; and (4) Johnston's failure to pay his agreed share of equity capital.[31] The plaintiffs also point to the representation by the defendants' lawyer, Mr. Greenspoon, that no TCI

---

471 F.2d 712, 713 (8th Cir.1973) (finding as part of bases for award of attorneys' fees that party had urged witness to give misleading testimony, bribed a handwriting expert and falsified certain records for trial); *Kreager v. Solomon & Flanagan, P.A.,* 775 F.2d 1541, 1543 (11th Cir.1985).

**28.** *See, e.g., Bower v. Weisman,* 674 F.Supp. at 112; *see generally* 31 A.L.R. Fed. 833 § 5 ("the award must be limited to an amount covering only the necessary efforts shown to have been occasioned by the bad faith or oppressive or obstinate conduct of the adversary").

**29.** *See Chambers v. NASCO,* 501 U.S. 32, 47 n. 11, 111 S.Ct. 2123, 2134 n. 11, 115 L.Ed.2d 27 (1991); *Resolution Trust Corp. v. Bright,* 6 F.3d 336, 340 (5th Cir.1993); *Yagman v. Republic Ins.,* 987 F.2d 622, 628 (9th Cir.1993); *see gener-*

*ally* Veronica J. Cherniak, "Resolution Trust Corporation v. Bright: The Fifth Circuit Holds Attorneys to a Subjective Standard of Bad Faith" 69 *Tulane L. Rev,* 297 (Nov.1994).

**30.** *Chambers v. NASCO,* 501 U.S. 32, 44, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991) ("inherent powers must be exercised with restrain and discretion"); *Batson v. Neal Spelce Associates, Inc.,* 805 F.2d 546, 550 (5th Cir.1986) (a finding of bad faith requires a "stringent" standard); *Sierra Club v. U.S. Army Corps of Engineers,* 776 F.2d 383, 390 (2d Cir.1985), *cert. den.* 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986) (bad faith exception requires "clear evidence" that party's claims were without color and brought for improper purposes).

**31.** Op. 1/5/96, at 33.

II financial statements or stock ledgers existed "as far as [be] knew." [32] Because those documents were subsequently furnished as part of a settlement of the § 220 action, plaintiffs argue that Greenspoon's advice was either fraudulent or (at best) the product of Greenspoon's ignorance that the defendants purposefully chose not to correct.

In response, the defendants argue that they had every right to test the *bona fides* of the plaintiffs' request for the documents, as customarily occurs in § 220 actions. They argue that because the § 220 case was settled without any presentation of evidence or adjudication of their defense that Vendel was seeking the inspection for an improper purpose, the record is insufficient to support a finding of bad faith. Finally, defendants emphasize that under the settlement, the plaintiffs received less than all the information they had demanded in their § 220 action,[33] which (defendants argue) establishes that they had at least a colorable defense that the plaintiffs' inspection requests were overbroad.

■ The Court is constrained to agree, albeit with reluctance, with the defendants' position. Concededly, the defendants' pre-litigation conduct is highly suspect, given the Court's ultimate factual findings on the merits of this § 225 action. Nonetheless, without the benefit of an adjudication or (at the very least) a more developed presentation of the defendants' defenses to the § 220 action, the present record is insufficient to support the conclusion that the defendants' opposition was in bad faith. Accordingly, the plaintiffs have not established their entitlement to an award of their attorneys' fees incurred in prosecuting their § 220 action.

## VI. *THE CLAIM FOR FEES INCURRED IN THIS § 225 PROCEEDING*

The plaintiffs' application for fees incurred in prosecuting this § 225 proceeding, however, stands on a different footing, because this action, unlike the § 220 action, was decided on the merits after considerable pre-trial proceedings and a trial. During the course of the litigation the Court had the opportunity to observe the defendants and their conduct of the litigation. The trial evidence demonstrated overwhelmingly that Vendel was the majority shareholder of TCI II. That evidence, considered together with the defendants' conduct both before and during this litigation, established a highly disturbing pattern of deceitful, bad faith conduct that could only have been intended to delay the inevitable day of reckoning, and to enable the defendants to continue mulcting the corporation without detection. No court should countenance such an abuse of the litigation process, and this Court surely will not. I therefore conclude that in these highly unusual circumstances, an award of attorneys' fees and costs assessed against the defendants is fully warranted. What follows is an elaboration of my reasons.

### A. *The Defendants' Underlying, Conduct Leading to this Litigation*

■ The first inquiry concerns whether the defendants' underlying pre-litigation conduct justifies an award of attorneys' fees under the third exception to the American Rule, under which a Court may award attorneys' fees against the losing side if "the suit involved bad faith, fraud, 'conduct that was totally unjustified, or the like.' " [34] In that setting attorney's fees are treated as an element of damages.[35] In deciding the merits of this action, this Court found that during the years preceding its filing, Johnston and Spillane "engaged in a pervasive deception of Mr. Vendel," [36] conduct that (plaintiffs argue) justifies an award of attorneys' fees. I cannot agree. Standing alone, that pre-litigation

---

**32.** PX 47.

**33.** *See* Defs. Opposition to Pls.App. For Atty. Fees, Ex. 18.

**34.** *Barrows, supra* note 19, at 2 (quoting *Weinberger v. UOP, Inc.*, Del. Ch., 517 A.2d 653, 656 (1986)).

**35.** *Id.*

**36.** Op. 1/5/96 at 33. Specifically, the defendants were found to have concealed from Mr. Vendel the conduct enumerated at pages 232–233, *supra*, of this Opinion.

underlying conduct is not sufficient to support an attorneys' fees award.[37]

 That conduct is, however, evidence supportive of the Court's finding that the defendants' opposed this lawsuit, and conducted their defense in bad faith. *See* Part V, *infra*. That is because the defendants' pre-litigation conduct furnished the motive and incentive for defendants to oppose the lawsuit and to resort to bad faith conduct in defending the litigation. Once Vendel began questioning the defendants' mismanagement of the corporation, the defendants knew they were at risk of losing their ability to exploit TCI II free of detection or accountability. Once Vendel commenced this § 225 action, with its concomitant risk of exposure of the defendants' past misdeeds, the defendants became subjected to the further risk of having to reimburse the corporation for any illicit payments. Given those potential consequences, the defendants' incentive to delay, if not altogether obstruct, Vendel's attempt to obtain control of TCI II in this litigation, is undeniable.

### B. *The Defendants' Bad Faith Opposition to Vendel's Claim*

 The next inquiry concerns whether the record supports a finding that the defendants opposed Vendel's claim in bad faith because at the time this action was filed they knew that Vendel's claim that he was TCI II's majority shareholder, was valid. In its January 5, 1996 Opinion, the Court found that the evidence at trial established that: (i) Vendel and Johnston had agreed that their shareholdings would be proportionate to their respective investments in the corporation; and (ii) Vendel had invested the majority of the equity, and, therefore, was TCI II's majority shareholder.

In support of their position that the parties intended their shareholdings to be proportionate to their respective investments, the plaintiffs relied upon the following evidence: (i) Johnston's handwritten financial statements showing that the stock ownership proportions would follow the parties' equity investments; (ii) TCI I's 1984 federal and state income tax returns disclosing that Arbitrium owned 71 % of the company's voting stock; and (iii) TCI II's 1985 charter amendment disclosing that the majority of TCI II shares had been issued to a non-U.S. investor, which could only have been Arbitrium. The defendants attempted to explain away these documents—which they themselves had created—but the Court concluded that to accept defendants' explanations "would require the Court to find a host of critical TCI II documents to be riddled with repeated and coincidental 'mistakes.' "[38]

The evidence the defendants presented to support their position included documents that (defendants argued) established that the parties' intended that Johnston would be TCI II's majority shareholder without regard to the amount of his investment. That evidence included a memorandum, handwritten financial statements, correspondence from Vendel to Johnston, and a stock ledger. The Court found that evidence entirely unpersuasive. The memorandum did not mention relative equity investments, and the financial statements contained calculations of the parties' relative equity investments that made sense only if it were assumed that equity investment *would* be proportionate to stock ownership. The correspondence, in which Vendel acknowledged his status as a minority shareholder, was the product of Vendel's mistaken belief that Johnston had actually invested the majority of the equity—a belief purposefully induced by the defendants' fraudulent concealment of Johnston's failure to invest the agreed-upon equity amount. Finally, the stock ledger—a document of questionable credibility because for years the defendants had refused to provide Vendel with a stock certificate—was found not probative on the issue of whether shareholdings would correspond to equity investment. In short, the defendants' evidence did not support their position.

Most damaging to defendants was the evidence they relied upon to support their claim that Johnston had, in fact, contributed the majority of the equity investment. Multitu-

---

**37.** *Id.*, at 3.

**38.** Op. 1/5/96, at 17.

dinous contemporaneous documents *created by defendants* either showed, or were consistent with, an initial equity investment of $250,000 by Vendel and of $100,000 by Johnston. The record also disclosed, however, that the parties had subsequently agreed that Johnston would be contributing additional equity, and that Vendel would be refunded a portion of his initial (majority) equity investment, so that Johnston would end up as TCI II's 53% shareholder, and Vendel its 47% shareholder. The critical question became whether that understanding was ever implemented. The Court found that it was not.

The plaintiffs relied upon TCI II's own ledgers, which showed that that understanding was never implemented. The defendants responded by offering a document, styled an "alternative loan ledger," to support their contrary claim that Johnston had, in fact, made the required equity contribution. Respecting that document, the Court found:

> The defendants' entire story, and the validity of their experts' testimony, presupposes the genuineness (as evidence) of the "alternative loan ledger" ... However, the "alternative loan ledger" was (it is claimed) "discovered" only at the eleventh hour—and only shortly after the plaintiffs' first in-Court disclosure of the evidence that the "alternative loan ledger" (serendipitously) refutes. The defendants offer no explanation of how a loan ledger purportedly created in February 1984, could include annual consulting fee expenses through 1992. To validate the "alternative loan ledger" would require this Court to reject many documents whose authenticity and contemporaneous character are undisputed, including the "official" loan ledger, the 1985 charter amendment and significant portions of TCI II's 1984 tax returns.[39]

Given the other evidence, and the defendants' "demonstrated pattern" of misleading this Court, other courts, and Mr. Vendel, the Court concluded that the "alternative loan ledger" had been manufactured as evidence for use at the trial.

To summarize, a multitude of authentic, contemporaneous documents, created by de-

fendants themselves, supported the plaintiffs' position that Vendel (Arbitrium) was the majority shareholder of TCI II. The defendants' response boils down to the argument that because defendants had *some* evidence that supported their position, that fact precludes a finding of "bad faith," and any resulting award of attorneys' fees. That argument, in my view, lacks merit.

This Court recognizes that an award of attorneys' fees is highly exceptional, and that a finding that the defendants acted in bad faith must be based upon clear evidence. This case involved such clear evidence. Although at trial the defendants did submit *some* evidence that supported their position, that evidence consisted of documents which were irrelevant, suspect, or falsified. That evidence, moreover, was trivial in comparison to the voluminous evidence, *created by defendants themselves*, that undermined their own position. Given the defendants' clear incentives to contest this action for ulterior reasons unrelated to the merits, the record here amply supports a finding that the defendants opposed this action in bad faith because at the time the action was filed, they knew that Vendel's claim to majority shareholder status was valid.

### C. *The Defendants' Conduct During the Litigation*

■ The defendants also conducted their defense of this action in bad faith. Three egregious examples of such bad faith conduct, occurring before, during, and after trial, should suffice. First, the defendants induced the Court to compel plaintiffs to submit to discovery, based upon representations to the Court that defendants later repudiated at the trial. Second, the defendants altered their testimony, repeatedly changed their positions, and falsified evidence at the trial. Third, and finally, the defendants disavowed their previous litigation positions in an effort to justify an indisputable breach of the Standstill Agreement.

---

**39.** Op. 1/5/96, at 30.

### 1. *The Defendants' Pre–Trial Conduct: The Depositions of Arbitrium*

In both the § 220 action and this § 225 proceeding the defendants disputed whether Arbitrium was a legitimate nominee of Vendel. In the § 220 action the Court denied the defendants' request for an additional deposition of Arbitrium and declined to postpone the trial.[40] In this § 225 proceeding, the defendants again moved to compel a deposition of Arbitrium by its chairman, Oswald Buehler, on the basis that defendants had "serious doubts" regarding Mr. Vendel's testimony that Arbitrium was merely his nominee.[41] The Court granted the defendants' motion to compel.

At his deposition Mr. Buehler confirmed that Arbitrium was a mere nominee. Mr. Buehler also testified that the nominee relationship between Vendel and Arbitrium had been administered by the Swiss law firm of Kunezli & Seeholzer. The defendants seized upon that testimony as a basis for requesting the Court to issue letters rogatory to depose a partner of that Swiss law firm. Based on the defendants' representation that they had "serious doubts" about Arbitrium's nominee status, this Court also granted that motion.[42]

At trial, the defendants reversed their stance, now claiming that since 1984 they knew that Arbitrium was a mere nominee for Vendel's TCI II shares. The defendants also testified that Johnston had even considered personally holding some of his TCI II shares through Arbitrium—testimony that was inconsistent with defendants' earlier attack upon the *bona fides* of the nominee relationship.[43] There are only two possible explanations for this change of position: (1) either the defendants' testimony (that they knew that Arbitrium was a mere nominee since 1984) was false, in which case the defendants intentionally misled the Court in order to support their merits position at trial; or (2) that testimony was true, in which event the defendants intentionally misled this Court into ordering needless discovery of Arbitrium and its Swiss law firm. Neither alternative is consistent with good faith on the part of defendants.[44]

### 2. *The Defendants' Conduct At Trial: Alteration of Testimony and Falsification of Documents.*

The defendants also demonstrated their willingness to change their sworn deposition testimony at the trial, as needed to suit their purposes. As discussed in this Court's January 5, 1996 Opinion, Johnston changed his sworn testimony on several issues, including: i) whether Vendel had objected to Johnston's efforts to convert his voting stock to non-voting stock; ii) whether TCI II had paid dividends; and iii) whether Johnston had considered using Arbitrium as his nominee.[45]

Moreover, when confronted with several documents defendants themselves had created and that were contrary to their litigation position, the defendants repeatedly asserted that those documents contained "mistakes." Finally, to support their position that Johnston had invested a majority of the corporation's equity, the defendants submitted at the eleventh hour an "alternative loan ledger" that the Court found had been created "out of whole cloth . . . solely for purposes of trial" in an effort to deceive this Court and the defendants' own expert.[46]

### 3. *The Defendants' Conduct After Trial: The Breach of the Standstill Agreement*

The defendants' willingness to reinvent their position and their testimony did not stop with the trial. During the trial, Johnston consistently testified that he had never received compensation from TCI II or Statek, and that the $6 million in payments he and Ms. Spillane had caused those corporations to pay to themselves were all loans.

**40.** Ltr. Op. 2/4/94.

**41.** Jenkins letter to the Court dated June 17, 1994.

**42.** Ltr. Op. 11/21/94.

**43.** Tr. 579, 582, 710–13, 747, 823–26.

**44.** *See Bower v. Weisman*, 674 F.Supp. 109, 112 (S.D.N.Y.1987) ("Perjury is obvious bad faith").

**45.** Op. 1/5/96, at 32.

**46.** *Id.*, at 29.

After trial, the plaintiffs claimed that Johnston had been receiving extraordinary payments recorded as "salary" in violation of the Standstill Agreement, and asked the Court to impose a constructive trust on those payments. In response, the defendants changed their position. They argued that those payments were not extraordinary because they represented compensation for services, and that Johnston had been receiving similar compensation since 1991. The Court refused to allow the defendants to repudiate their prior testimony.[47]

I conclude that the foregoing bad faith conduct independently warrants an award of attorneys' fees. Because that conduct permeated virtually this entire litigation, that alone would justify an award of all of the plaintiffs' attorneys' fees.[48] But, that conduct also supports the conclusion that the defendants in bad faith forced Vendel to commence and prosecute this action. The defendants' promiscuous alterations of testimony and wholesale shifting of positions are consistent with their vain quest to find some footing—any basis—upon which to erect a defense. Their fabrication of evidence to present even the semblance of a defense supports the conclusion that their entire defensive position was a sham.[49]

## VII. *THE REASONABLENESS OF THE ATTORNEYS' FEES*

■■■■ Having determined the plaintiffs' entitlement to attorneys' fees, the Court next must determine what is a reasonably appropriate amount. An award of attorneys' fees is limited to the fees reasonably incurred to prosecute this action.[50] In this case, Vendel has provided only a statement showing (summarily) that he incurred a total of $1,584,979 in fees, including $1,354,169 of attorneys' fees and $230,810 of expert witness fees.[51] Those amounts include the expenses plaintiffs incurred in the § 220 action, which have been found not recoverable. (*See supra* Part IV). Because the record discloses no allocation of fees between the two actions, or any itemized description of the services for which the fees in this action were incurred, or the basis (*e.g.*, hourly rates) for computing the amount, the Court has no record basis to determine whether those fees were reasonable. Therefore, further proceedings, and a more detailed record are needed to determine what amount of attorneys' fees is reasonable.

## VIII. *EXPERT WITNESS FEES*

Finally, the plaintiffs ask this Court to award all expert witness fees they incurred in this proceeding. Plaintiffs claim that the defendants' bad faith forced them to incur those expert witness expenses. The defendants respond that no expert witness fees should be awarded because the plaintiffs' trial expert's testimony did nothing to advance the fact-finding process. Moreover, defendants urge, even if the Court decides to award such fees, the award should be limited to the fees incurred for in-court testimony,

**47.** Ltr. Op. 10/6/95, at 5.

**48.** *See Chambers v. NASCO*, 501 U.S. 32, 57, 111 S.Ct. 2123, 2139, 115 L.Ed.2d 27 (1991) (court could award all fees where litigation was "part of a *sordid scheme of deliberate misuse of the judicial process*").

**49.** *See United States v. Philatelic Leasing, Ltd.*, 601 F.Supp. 1554, 1565 (S.D.N.Y.1985), *aff'd* 794 F.2d 781 (2d Cir.1986) ("when a litigating party *resorts to falsehood or other fraud in trying to* establish a position, the court may conclude the position to be without merit and that the relevant facts are contrary to those asserted by the party"); 2 *Wigmore on Evidence* § 278 (Chadbourn rev. 1979) ("It has always. been understood— the inference, indeed, is one of the simplest in human experience—that a party's falsehood or other fraud in the preparation and presentation of his cause, his fabrication or suppression of evidence by bribery or spoliation, and all similar conduct is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit. The inference thus does not necessarily apply to any specific fact in the cause, but operates, indefinitely though strongly, against the whole mass of alleged facts constituting his cause"); *cf. Batson v. Neal Spelce Associates, Inc.*, 805 F.2d 546, 551 (5th Cir.1986) (plaintiff's withholding of documents necessary to defend against claim for damages created a presumption that damage claim was unfounded).

**50.** *See Judge v. City of Rehoboth Beach, supra* note 25, at 10.

**51.** Aff. of Kevin F. Dages, 8/27/96 at ¶ 12.

and should exclude all out-of-court consulting fees.

Under 10 *Del. C.* § 8906, an award of expert witness fees is limited to "witnesses testifying as experts." In *Sliwinski v. Duncan*,[52] the Delaware Supreme Court delineated guidelines for awarding expert fees under that statute. Under those guidelines this Court may award fees for "time necessarily spent in attendance upon the court for the purpose of testifying," as well as travel time to the court, but may not include time spent listening to the other witnesses, consulting with the party or counsel, or providing services in advance of time expended in conjunction with actually testifying at trial.[53]

This Court is not limited, however, to an award of expert fees predicated upon the statute. The Court may award such other expenses as it deems appropriate under its inherent equitable powers, if it finds a "compelling special equity."[54] In my view, the fact that the defendants in bad faith forced Vendel to file this action, and then defended the litigation with bad faith tactics, warrants an award of all expert witness fees the plaintiffs necessarily incurred. Having already found that this case comes within the bad faith exception to the American Rule, the Court can perceive no logical basis for awarding reasonable attorneys' fees, but not reasonable expert witness fees.

Although the Court's reliance upon the expert's testimony is not a prerequisite to an award of expert witness fees, the expert's opinion must, nonetheless, be "helpful to the Court."[55] The expert witness fees must also be reasonable in relation to the services provided.

The plaintiffs argue that their expert's services were helpful because "[w]ithout expert assistance, plaintiffs could *not* have deciphered the melange of documents, determined which contributions were treated as equity and which were treated as loans, or sorted out the defendants' 'real' documents from those manufactured for trial."[56] The difficulty is that this Court, which lacks accounting expertise, is unable to assess which calculations, issues, and findings required the expertise of an accountant and which (if any) could have been performed by a layman. A more thorough explication of that subject is needed to assist the Court to determine what amount of expert witness fees, if any, should be taxed to the defendants as costs.

\* \* \* \* \* \*

Counsel shall submit a form of order implementing the rulings made herein.

---

52. 608 A.2d 730 (1992) (referencing unpublished opinion No. 260, 1991 (Jan. 15, 1992))

53. *See also Stevenson v. Henning*, Del.Supr., 268 A.2d 872 (1970); *State ex rel. Price v. 0.0673 Acres of Land*, Del.Supr., 224 A.2d 598 (1966).

54. *See Weinberger v. UOP, Inc.*, Del. Ch., 517 A.2d 653, 657 (1986).

55. *Id.*

56. Pls. Reply to Defs. Opposition to Pls.App. for Atty Fees, at 19.