**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

**SELENA E. MOLINA**
**SENIOR MAGISTRATE IN CHANCERY**

**LEONARD L. WILLIAMS JUSTICE CENTER**
**500 NORTH KING STREET, SUITE 11400**

Report: June 3, 2025
Date Submitted: March 12, 2025

Ronald N. Brown, III, Esquire
Daniel P. Klusman, Esquire
DLA Piper LLP
1201 N. Market Street, Suite 2100
Wilmington, DE 19801

Loren R. Barron, Esquire
Kaufman Dolowich
222 Delaware Avenue, Suite 720
Wilmington, DE 19801

Re:   *Magna-D Global Healthcare No. 1 Private Equity Fund v. CoImmune, Inc.*, C.A. No. 2024-0456-SEM

Dear Counsel:

Pending before me is the plaintiff's motion for sanctions. The plaintiff argues that the defendant engaged in bad faith litigation and made misrepresentations to the Court in this summary books-and-records proceeding. The defendant's conduct, per the plaintiff, violates Court of Chancery Rule 11. I disagree. I find Rule 11 is not the proper vehicle to address the defendant's conduct; I do, however, find good cause to shift fees in the plaintiff's favor under the bad faith exception to the American Rule.

## I.   BACKGROUND

This is a books-and-records proceeding initiated by Magna-D Global Healthcare No. 1 Private Equity Fund (the "Plaintiff") against CoImmune, Inc. (the "Defendant"). The matter proceeded before me on an expedited basis: it was

assigned to me by the Chancellor on April 30, 2024,[1] tried on August 8, 2024,[2] and after entertaining post-trial argument on August 28, 2024,[3] I issued my final post-trial report telephonically on September 9, 2024.[4] As the time between assignment and trial suggests, this matter had a bit of a rocky start—the Defendant failed to timely respond to the complaint and the Plaintiff moved for judgment by default, but I ultimately granted the Defendant an extension and heard the matter on its merits.[5]

In my post-trial report, I recommended that judgment be entered in favor of the Plaintiff.[6] More specifically, I held that the Plaintiff was entitled to a court-ordered production under a "Shareholders' Agreement" which granted the Plaintiff, as a stockholder, greater inspection rights than under Section 220 of the Delaware General Corporation Law. As to which documents the Defendant needed to produce, I was, unfortunately and avoidably, at an informational disadvantage; a situation I foresaw but tried to avoid.

---

[1] Docket Item ("D.I.") 2.

[2] D.I. 45.

[3] *See* D.I. 53.

[4] D.I. 57.

[5] *See* D.I. 22–23.

[6] *See* D.I. 57.

After trial, I wrote to counsel about several lingering questions in my mind, which I directed them to be prepared to address at post-trial argument.[7] Those questions included, in pertinent part: (1) what records existed within the Defendant's possession, custody, and control for production, and (2) whether the Defendant's inactive status and winddown (which came out at trial) would interfere with, or negate my ability to enforce, a court-ordered production, and if so, how.

Despite this direction, and as reflected in my post-trial ruling, the Defendant was not prepared to address these questions at post-trial argument. As to what records existed for production, the Defendant's counsel did not "have a clear answer."[8] The Defendant conceded, however, that there may be records on a server, which had been discussed at trial, but that the Defendant had not "cataloged the whole server" and going through the specific documents requests, even by the time of post-trial argument, was "a bit of unknown territory" for the Defendant.[9]

These answers were unsatisfactory. Not only did I expressly direct the Defendant to come armed with this information at post-trial argument, but the Chancellor directed that the same type of information be disclosed much earlier in these proceedings. The Chancellor's April 30, 2024 assignment letter in this action

---

[7] D.I. 46.

[8] D.I. 53 at 41:14–19.

[9] *Id.* at 41:22–42:13.

directed the parties to promptly meet and confer, during which the Defendant was expected to disclose to the Plaintiff if requested documents did not exist and, for those that did, the location thereof.[10] The Defendant did not do that, and it created a noticeable gap in our record at trial (hence my post-trial letter and directions for post-trial argument). With the Defendant's failure or refusal to engage, I weighed the gap against the Defendant and ordered that the entire server be produced, subject to the parties' existing confidentiality agreement.

The Defendant filed partial exceptions to my post-trial report, solely regarding production of the server.[11] In its opening brief on exceptions, the Defendant reported that it was no longer in operation, the server was now under the control of a different entity, the server also housed documents regarding two other entities (one of whom was the entity apparently now controlling the server), and that representations from a witness for the Defendant about her ability or authority to access the server were inaccurate and needed to be corrected.[12] In simple terms, through the exceptions the Defendant represented it did not have control over, or even access to, the server, and thus could not comply with my production order. The Plaintiff decried these

---

[10] *See* D.I. 2.

[11] D.I. 55.

[12] D.I. 59.

arguments as an "about-face" which "directly contradict[ed] multiple representations made by [the Defendant] and its witness[.]"[13]

This about-face is worth a closer look. At the center of it is Lori Harrelson, who was the Defendant's chief financial officer. At her June 24, 2024 deposition, Ms. Harrelson testified that she still had access to the server, and that some documents would have been pulled therefrom.[14] Then, at trial, she changed her tune to express that she did not attempt to look into the server for any of the requested documents.[15] The story changed once again through the exceptions briefing where the Defendant explained that, actually, Ms. Harrelson "had access to the server prior to December 2023 when she pulled various documents and saved them onto her personal computer[,]" but that she has not had such direct access since.[16] And although Ms. Harrelson stated that she has "a relationship" with the owner of the

---

[13] D.I. 64 at 2.

[14] D.I. 59 Ex. B. Such was confirmed through a deficiency letter, also dated June 24, 2024, which stated that "[f]or practical purposes [the] Defendant has ceased to exist, so questioning if [the] Defendant has access to its own books and records is more of an ontological question than a practical one. The remaining records are accessible upon request and are located on a server in Durham, North Carolina. The former IT director for [the Defendant] has maintained control over the servers."). D.I. 62 Ex. D at 2. And the Defendant's counsel's post-trial argument echoed a similar sentiment, relaying that the Defendant did not have "*regular* access to the server[.]" D.I. 53 at 41:19–20 (emphasis added).

[15] D.I. 48 at 202:3–6.

[16] D.I. 59 at 2.

server and could access it to obtain additional documents for production, she could

not provide direct access to the Plaintiff,[17] despite her earlier representations.

These evolutions happened outside my virtual earshot, in exceptions which

were assigned to Vice Chancellor Cook. Briefing was complete on November 8,

2024, and the Vice Chancellor promptly scheduled a status conference for November

25, 2024.[18] There, the Vice Chancellor questioned the Defendant's attempt to revise

or supplement the trial record through exceptions, emphasizing that exceptions are

heard on the same record as that before the Magistrate Judge, and that new matters

should be presented to the Magistrate Judge in the first instance.[19] He also noted the

"very lengthy chain of events in which the [Defendant] should have been upfront

about not having access to the server."[20] He concluded: "the upshot here is folks

cannot stay silent before the Magistrate Judge on these extremely material issues and

---

[17] *Id.* The briefing representations were coupled with an affidavit from Ms. Harrelson, wherein she affirmed that files were stored on a server not exclusive to the Defendant, and contained data and files from at least two other entities. D.I. 56.

[18] *See* D.I. 77.

[19] *Huffman v. DeMatteis*, 2021 WL 120911, at *2 (Del. Ch. Jan. 13, 2021) (remanding a matter on exceptions to the presiding Magistrate Judge because of the "development of the record[] following the [Magistrate Judge's] issuance of the [o]rder . . . [and] to give the [Magistrate Judge] an opportunity to evaluate . . . and revisit her findings in light of that information"); *see also* Ct. Ch. R. 144(e) ("The Reviewing Judge hears exceptions based on the record before the Magistrate in Chancery, unless the Reviewing Judge determines to expand the record for good cause shown.").

[20] D.I. 77 at 5:20–23.

then attempt to raise new evidence and basically new arguments on exceptions, particularly where the arguments were clearly known or at issue or at least certainly knowable at the time of the proceedings before the Magistrate Judge."[21] The Vice Chancellor thus remanded the matter to me so that I could consider the new evidence and the Defendant's argument that it would be unable to comply with my ruling.[22]

After remand, things became even messier. Counsel for the Defendant moved to withdraw,[23] and the Plaintiff opposed that request.[24] Then counsel to the Defendant reported, on December 10, 2024, that the company in possession of the server would be moving and taking the server with it at the end of the year.[25] Recognizing the exigency and concerned about preservation, I scheduled an expedited hearing for December 20, 2024.[26] Shortly after my scheduling minute order, the Plaintiff filed this motion for sanctions.

The December hearing allowed the parties to reset. The looming end-of-year deadline was resolved, the parties were directed to continue their meet and confer efforts, and all agreed that this summary proceeding was overdue for a final

---

[21] *Id.* at 6:19–7:2.

[22] D.I. 69.

[23] D.I. 71; *see* D.I. 81.

[24] D.I. 74.

[25] D.I. 78.

[26] D.I. 82; *see* D.I. 86.

resolution. To that end I denied the motion to withdraw without prejudice, directed the parties to continue their meet and confer efforts and report back on the status of the server within one week, and ordered expedited briefing on the motion for sanctions.[27] The parties complied, and in a December 27, 2024 status report reported, in pertinent part, that the server was being preserved before year's end, and that certain information was already in the Plaintiff's hands for review.[28] Then, on December 31, the Defendant formally withdrew its partial exceptions to my post-trial report, leaving the motion for sanctions as the sole remaining issue.[29] The motion for sanctions was fully briefed on January 14, 2025, and argued on March 12, 2025.[30] This is my ruling, which leaves only one outstanding issue: the amount of fees to be shifted to the Defendant.

## II. ANALYSIS

The Plaintiff seeks sanctions under Court of Chancery Rule 11; I find Rule 11 an ill fit. But the Plaintiff argues, alternatively, for relief within the Court's inherent powers, and has demonstrated that the Defendant engaged in bad faith litigation sufficient to support fee shifting in the Plaintiff's favor.

---

[27] *See* D.I. 86.

[28] D.I. 87.

[29] D.I. 89.

[30] *See* D.I. 93, 95–97.

## A. Sanctions should not be shifted under Rule 11.

The Plaintiff initially premised its request for sanctions under Rule 11. But Rule 11 does not provide an avenue for the relief the Plaintiff seeks. There are two primary reasons: (1) the Plaintiff did not provide the required notice and opportunity to cure, and (2) the misrepresentations do not fall within the type of documentation contemplated by Rule 11(b).

Court of Chancery Rule 11(b), our corollary to Federal Rule of Civil Procedure 11(b), provides, in pertinent part:

> By presenting to the Court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

If Rule 11(b) is violated, this Court may impose appropriate sanctions on the attorney, law firm, or party, which violated, or is responsible for violating, Rule 11(b). But before that happens, Rule 11(c) requires "notice and a reasonable opportunity to respond[.]" That notice requirement includes pre-filing service of any Rule 11 motion on the alleged violator.[31] And a Rule 11 motion "must not be filed

---

[31] Ct. Ch. R. 11(c)(2).

or be presented to the Court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service or within another time the Court sets."[32] The Plaintiff neither provided adequate notice nor demonstrated that Rule 11(b) was violated.

The Plaintiff did not serve the motion on the Defendant before filing it with the Court. The Defendant, thus, did not have the 21-day corrective period provided in Rule 11(c)(2). The Plaintiff argues against these procedural requirements as "hypertechnical, form-over-substance" matters and compels me to invoke my inherent authority to police these proceedings. I do so below. But in doing so, I decline to disregard the procedural, safe harbor requirements of Rule 11.[33] The Plaintiff's failure to provide the required notice and wait the curative period renders the application under Rule 11 misplaced and unripe.[34]

Even if I were to set aside the notice requirement, the Plaintiff has failed to identify what "pleading, written motion, or other paper" presented to the Court

---

[32] *Id.*

[33] Such requirements match those of our sister court and federal trial courts and have been interpreted strictly. *See, e.g.*, *Speidel v. St. Francis Hosp., Inc.*, 2003 WL 21524694, at *5, *6 n.42 (Del. Super. July 3, 2003) (denying a motion for sanctions, recognizing Rule 11's "strict procedural requirements[,]" and declining to impose sanctions through any "inherent power[,]" on fact-specific grounds).

[34] In so holding, I reject the Plaintiff's argument that by ordering expedited briefing I dispensed with, or the Defendant waived, any procedural defects.

contained a factual misrepresentation. "Rule 11 applies to all papers that an attorney files in connection with a matter pending before the Court."[35] It does not apply to discovery disclosures or oral representations, both of which have other avenues through which any misstatements can and will be addressed.[36] Such are precisely the statements the Plaintiff points me to as misrepresentations—Ms. Harrelson's deposition testimony and affidavit, the Defendant's response to a discovery deficiency letter, and counsel's statements at post-trial argument. These misrepresentations are better addressed through the Court's inherent authority to police litigation misconduct, rather than the more narrowly tailored Rule 11.

### B. Fee shifting is, nonetheless, warranted.

Even though Rule 11 is not the right fit, I would be remiss to allow this action to close without the Defendant's conduct being addressed. In connection with our expedited trial, the Plaintiff advocated for bad faith fee shifting. At the time of my post-trial ruling, I was unconvinced. I explained:

---

[35] *Xen Invs., LLC v. Xentex Techs., Inc.*, 2003 WL 25575770, at *2 (Del. Ch. Dec. 8, 2003).

[36] Ct. Ch. R. 11(d); *see, e.g.*, Ct. Ch. R. 37 (sanctions for discovery misconduct); *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *22 (Del. Ch. Sept. 10, 2018) (finding that misrepresentations "in sworn statements and while under oath . . . . constitute[d] bad faith litigation conduct that warrant[ed] the shifting of attorneys' fees and costs as sanctions"); *Tornetta v. Musk*, 2024 WL 2735445, at *3 (Del. Ch. May 28, 2024) ("If I have interpreted the defendants' position incorrectly, then defense counsel—as officers of the court—are duty-bound to correct it."); *Choupak v. Rivkin*, 2015 WL 1589610, at *23 (Del. Ch. Apr. 6, 2015) (citing Delaware's criminal perjury standards).

Although I have expressed some frustration with the [D]efendant's failure to comply with the Chancellor's assignment letter, I've accounted for that in my production recommendation and it does not, in my mind, undermine the parties' reasonable dispute over scope. That was a live and complicated issue, not the type of indisputable, clearly defined right that supports fee shifting. The [P]laintiff has failed to convince me that the [D]efendant engaged in the type of overarching bad faith which would justify an order that all of the [P]laintiff's fees be shifted to the [D]efendant.[37]

In the motion for sanctions, as an alternative to Rule 11, the Plaintiff reasserted its request. It should be granted. The circumstances have materially changed since my post-trial ruling. Exercising my "inherent authority under the American Rule to award fees as a consequence of bad faith conduct either preceding the action or during the action[,]" I consider, and grant, the Plaintiff's request for a sanction of fee shifting under the bad faith exception to the American Rule.[38]

"Under the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs."[39] There are several exceptions.

For example, fees may be shifted if: (i) recovery of fees is provided by statute or court rule; (ii) there is a contractual provision regarding entitlement to attorneys' fees; (iii) a party has acted in bad faith in connection with the conduct of the litigation process; (iv) a party fails to abide by a court order or is held in contempt; and (v) the action results

---

[37] D.I. 57 at 23:13–24.

[38] *In re Tr. for Grandchildren of Wilbert L.*, 2013 WL 771900, at *2 (Del. Ch. Feb. 27, 2013); *cf. In re Coinmint, LLC*, 261 A.3d 867, 889 (Del. Ch. 2021) (revisiting, *sua sponte*, an earlier ruling based on the Court's mandate to police subject matter jurisdiction).

[39] *Mahani v. Edix Media Gp., Inc.*, 935 A.2d 242, 245 (Del. 2007).

>  in the creation, protection or distribution of a common fund or confers a corporate benefit.[40]

Implicated here is the bad faith exception.

The bad faith exception "includes cases where the litigation process itself is conducted in bad faith. In such cases, the fees typically awarded are the additional fees incurred as a result of the bad faith conduct."[41] Although the Defendant's shifting stories regarding the server fall outside of Rule 11, they amount to bad faith litigation conduct which "implicates this court's inherent authority to police the litigation process, to ensure that acts that undermine the integrity of that process are sanctioned."[42] The Plaintiff's fees incurred in responding to the Defendant's post-trial conduct should be shifted. I have considered revisiting my earlier denial of full-case fee shifting, but exercise restraint and discretion to work an appropriate deterrent and offset the prejudice to the Plaintiff, but not penalize unnecessarily.[43]

---

[40] *In re Del. Pub. Schs. Litig.*, 312 A.3d 703, 716 (Del. 2024).

[41] *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 231–32 (Del. Ch. 1997), *aff'd*, 720 A.2d 542 (Del. 1998).

[42] *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 954 A.2d 911, 932 (Del. Ch. 2008) (citing *Gebhart v. Ernest DiSabatino & Sons, Inc.*, 264 A.2d 157, 159 (Del. 1970)).

[43] *See Aveta, Inc. v. Bengoa*, 2010 WL 3221823, at *6 (Del. Ch. Aug. 13, 2010) ("When awarding expenses as a contempt sanction or for bad faith litigation tactics, this Court takes into account the remedial nature of the award.").

## III. CONCLUSION

For these reasons, the request that the Defendant be sanctioned under Rule 11 is denied. But exercising my inherent authority, I find that post-trial fees should instead be shifted under the bad faith exception to the American Rule. The Plaintiff shall submit a fee affidavit within two weeks. The Defendant may respond within two weeks of filing. I will then issue an order shifting fees, which will be my final report in this action, to which exceptions may be filed under Court of Chancery Rule 144.

Respectfully submitted,

/s/ *Selena E. Molina*

Senior Magistrate in Chancery