**H. Frederick JOHNSTON; Sandra Spillane, Plaintiffs–Appellants,**

v.

**ARBITRIUM (CAYMAN ISLANDS) HANDELS AG; Miklos Vendel, Defendants–Appellees.**

**Docket No. 98–9231**

United States Court of Appeals, Second Circuit.

Argued: May 3, 1999

Decided: Dec. 13, 1999

Allan M. Pepper, Kaye, Scholer, Fierman, Hays & Handler, LLP (Michael Malina, Alan E. Rothman, of counsel), New York, NY, for Plaintiffs–Appellants.

Thomas J. Allingham II, Skadden, Arps, Slate, Meagher & Flom LLP (James L. Love, of counsel), Wilmington, DE, for Defendants–Appellees.

Before: CABRANES and SACK, Circuit Judges, and SHADUR, District Judge.[*]

Judge SHADUR dissents in a separate opinion.

SACK, Circuit Judge:

Plaintiffs H. Frederick Johnston and Sandra Spillane appeal from a judgment of the United States District Court for the District of Connecticut (Robert N. Chatigny, *Judge*) dismissing their complaint. Johnston and Spillane seek a declaratory judgment that they own fifty-two percent of the outstanding shares of stock of Technicorp International II, Inc. ("TCI II"). The district court concluded that a previous decision by the Delaware Court of Chancery (Jack B. Jacobs, *Vice Chancellor*) that Johnston and Spillane did not own a majority of the shares of TCI II, made in the course of *in rem* proceedings determining the company's directorships, precluded them from obtaining a declaratory judgment to the contrary in the district court. The district court therefore dismissed the complaint.

We affirm.

## BACKGROUND

This appeal is one chapter in a lengthy tale of ongoing legal disputes between plaintiffs H. Frederick Johnston and Sandra Spillane and defendants Miklos Vendel and his corporate nominee, Arbitrium (Cayman Islands) Handels AG ("Arbitrium").

In 1984, Vendel and Johnston entered into an oral agreement for them jointly to purchase Statek, a California-based manufacturer of microelectronic components. According to the agreement, TCI II was to serve as the entity through which the acquisition would be made. Johnston, a Harvard Business School graduate, was to manage the to-be-acquired company. Accordingly, he became the Chairman, President, and Treasurer of TCI II. Spillane, Johnston's long-time business associate, was elected TCI II's Vice–President and Secretary and also became one of its directors. Vendel was not involved in the management of the company.

Johnston and Vendel's failure to reduce their business arrangement to writing fueled an ensuing disagreement over who owned the majority of TCI II's outstanding shares of stock and thus controlled the company. In October 1993, Vendel and Arbitrium made a demand pursuant to § 220 of the Delaware General Corporation Law to inspect certain TCI II books and records as well as the company's stock list. When TCI II failed to respond, Vendel and Arbitrium initiated an action to compel inspection. That lawsuit ended in a settlement under which TCI II agreed to produce the requested documents.

Based on a review of those documents, Vendel concluded that through Arbitrium he held a majority of TCI II's outstanding shares. As a result, on May 2, 1994 Vendel and Arbitrium executed a written consent pursuant to § 228 of the Delaware General Corporation Law purporting to vote their majority stock interest to remove Johnston and Spillane as TCI II's directors and to appoint Vendel as the corporation's sole director. Johnston and Spillane refused to acknowledge the validity of the consent. Vendel and Arbitrium then instituted an action in Delaware Chancery Court under § 225 of the Dela-

---

[*] The Honorable Milton I. Shadur, of the United States District Court for the Northern District of Illinois, sitting by designation.

ware General Corporation Law (the " § 225 Action") to determine the lawful directors of TCI II.

After a six-day trial, the chancery court held Vendel to be the sole lawful director of TCI II. The court based its decision on findings that:

> (1) Vendel and Johnston agreed that their stock ownership in TCI II would be proportionate to their actual equity investment, (2) Vendel's net equity investment in TCI II was $235,000 and Johnston's investment was $100,000, and (3) therefore, Vendel, through Arbitrium, is the majority shareholder of TCI II, and the actions taken by them [removing Johnston and Spillane as TCI II's directors and making Vendel its sole director] are valid and legally effective.

*Arbitrium (Cayman Islands) Handels AG v. Johnston*, No. Civ.A. 13506, 1996 WL 12149, at *15, 1996 Del. Ch. LEXIS 1, at *49 (Del. Ch. Jan. 5, 1996). The Delaware Supreme Court affirmed without opinion. *See Johnston v. Arbitrium (Cayman Islands) Handels AG*, 683 A.2d 59 (Del.1996) (table opinion).

Vendel and Arbitrium then moved to recover the attorneys' fees that they had incurred in connection with the prosecution of the § 225 Action. The chancery court, recognizing that under the "American Rule" each party ordinarily pays his or her own attorneys' fees, nonetheless granted the motion under the exception for "cases where the court finds that the litigation was brought in bad faith or that a party's bad faith conduct increased the costs of litigation." *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del.Ch.1997). According to Vice Chancellor Jacobs:

> The trial evidence demonstrated overwhelmingly that Vendel was the majority shareholder of TCI II. That evidence, considered together with the defendants' conduct both before and during this litigation, established a highly disturbing pattern of deceitful, bad faith conduct that could only have been intended to delay the inevitable day of reckoning,

and to enable the defendants to continue mulcting the corporation without detection.

*Id.* at 233. The attorneys' fee award was based in part on Johnston and Spillane's "promiscuous alterations of testimony and wholesale shifting of positions" and their "fabrication of evidence to present even the semblance of a defense" which "support[ed] the conclusion that their entire defensive position was a sham." *Id.* at 237. The award, ultimately set at $1,644,-952, was affirmed by the Delaware Supreme Court. *See Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 547 (Del.1998).

Meanwhile, Johnston and Spillane instituted actions in both Switzerland and the Cayman Islands in which they claimed that they owned a majority of TCI II's shares. In response, Vendel and Arbitrium filed a motion in the Delaware Chancery Court alleging that Johnston and Spillane's actions were in violation of the court's § 225 order and seeking to have them held in contempt (the "Contempt Action"). *See Arbitrium (Cayman Islands) Handels AG v. Johnston*, No. Civ.A. 13506, 1997 WL 589030, 1997 Del. Ch. LEXIS 132 (Del. Ch. Sept. 17, 1997). The chancery court denied the motion because it sought *in personam* relief for violation of an order resulting from a § 225 action, which is in the nature of an *in rem* proceeding. *See* 1997 WL 589030, at *4. In the course of so ruling, the court said, "[T]he issue of ultimate ownership [of TCI II stock] has never been decided by a Court having appropriate jurisdiction." *Id.* at *5.

In June 1996, Vendel, who now controlled TCI II through Arbitrium, caused TCI II to bring a lawsuit in the chancery court against Johnston and Spillane and various corporate entities they controlled for alleged breaches of fiduciary duties (the "Fraud Action"). *See Technicorp Int'l II, Inc. v. Johnston*, No. 5084, 1997 WL 538671, 1997 Del. Ch. LEXIS 126 (Del. Ch. Aug. 25, 1997). In ruling on TCI II's motion for summary judgment, the

chancery court addressed the preclusive effect of its findings in the § 225 Action. The court determined that Johnston and Spillane were bound by the court's prior finding that Vendel was the majority shareholder of TCI II because it was "essential to resolving the ultimate § 225 issue ... and also was actually litigated by these same parties." 1997 WL 538671, at *8. The court also held, however, that its findings in the § 225 Action regarding breaches of fiduciary duty by Johnston and Spillane were not essential to its determination and therefore were not binding. *See id.* at *18. Although the court ultimately denied TCI II's summary judgment motion, its order, entered on August 22, 1997, explicitly stated that the § 225 finding that "Miklos Vendel has at all relevant times been TCI II's majority shareholder" was "preclusive and binding" in the Fraud Action.

In a letter to the court dated October 24, 1997, Johnston and Spillane argued that this portion of the order was inconsistent with the chancery court's holding in the Contempt Action that "the issue of ultimate ownership [of TCI II stock] has never been decided by a Court having appropriate jurisdiction." In a letter opinion dated October 28, 1997, the court rejected this argument and clarified its opinion in the Contempt Action. Vice Chancellor Jacobs wrote that his ruling in the Contempt Action "was not intended to suggest that the Court left open the issue of Mr. Vendel's status as majority (at least 70%) shareholder of TCI II. All the Court left open was the issue of whether Vendel owns 70% of TCI II, or some greater amount."

On September 23, 1997, while they were seeking to modify the chancery court's ruling in the Fraud Action, Johnston and Spillane began this action in the United States District Court for the District of Connecticut seeking a declaratory judgment that they hold a majority of TCI II's outstanding shares. Undeterred by the chancery court's October 28 letter opinion, Johnston and Spillane continued with the district court action but amended their complaint to omit the allegation that the chancery court had never determined who owned a majority of TCI II's shares. According to the district court, Johnston and Spillane sought the judgment primarily so that "they [could] take [the declaration] to Delaware and start another 225 action." On August 7, 1998, the district court granted Vendel and Arbitrium's motion to dismiss based on its conclusion that collateral estoppel foreclosed Johnston and Spillane from relitigating in federal district court the issue of majority ownership of TCI II which had been decided in Delaware Chancery Court. This appeal followed.

## DISCUSSION

■ Johnston and Spillane claim that the district court erred in determining that they are collaterally estopped from seeking a declaratory judgment that they own a majority of the outstanding shares of TCI II. They assert that the factual findings made in the § 225 Action, an *in rem* proceeding, cannot bind them in a subsequent *in personam* action. We review the district court's dismissal of their action on collateral estoppel grounds *de novo*. *See Valley Disposal, Inc. v. Central Vermont Solid Waste Management Dist.*, 31 F.3d 89, 93 (2d Cir.1994).

### I.  Applicable Law

■ The doctrine of "[c]ollateral estoppel, or issue preclusion, bars the relitigation of issues actually litigated and decided in the prior proceeding, as long as that determination was essential to that judgment." *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir.1995).

Application of both [the] doctrines [of res judicata, or claim preclusion, and collateral estoppel, or issue preclusion] is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions.  To preclude parties from contesting matters that they have had a

full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions. *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979) (footnote and citations omitted).

■ Under the federal full faith and credit statute, state judicial proceedings "have the same full faith and credit in every court within the United States ... as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738. Accordingly, as the parties agree, to determine the preclusive effect of the Delaware Chancery Court's findings in the § 225 Action, a federal court applies Delaware law insofar as doing so is consistent with constitutionally protected due process. *See Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985); *Valley Disposal,* 31 F.3d at 98; *see also Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 83, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984) ("[I]ssues actually litigated in a state-court proceeding are entitled to the same preclusive effect in a subsequent federal ... suit as they enjoy in the courts of the State where the judgment was rendered.").

## II. Whether Factual Findings Made in an *In Rem* Proceeding Can Be Given Preclusive Effect in an *In Personam* Action

### A. Delaware Law

■ Delaware law provides that "[a] claim will be collaterally estopped only if the same issue was presented in both cases, the issue was litigated and decided in the first suit, and the determination was essential to the prior judgment." *Sanders v. Malik,* 711 A.2d 32, 33–34 (Del.1998). The law of this Circuit, applicable to cases not governed by state law, is similar. *See Central Hudson,* 56 F.3d at 368 (stating

that for collateral estoppel to apply to a decision by a federal court, the issue to be precluded must be (1) identical, (2) actually litigated and decided, and (3) necessary to support a valid judgment; there also must have been (4) a "full and fair" opportunity to litigate the issues in the prior proceeding).

■ Johnston and Spillane would have us recognize another requirement. They start with the proposition that jurisdiction in a § 225 action "can be conceptualized as in the nature of in rem jurisdiction, the 'rem' being the corporate office the title to which is in dispute." *Steinkraus v. GIH Corp.,* C.A. No. 11858, 1991 WL 3922, at *3, 1991 Del. Ch. LEXIS 8, at *7 (Del. Ch. Jan. 22, 1991); *see also Arbitrium,* 1997 WL 589030, at *4. They argue that because the § 225 Action was *in rem,* issues decided during its course, including the ownership of a majority of TCI II's shares, cannot be given collateral estoppel effect in this later case, which is based on *in personam* jurisdiction. We disagree.

■ The collateral estoppel effect of the § 225 Action has already been decided in the as yet incomplete Delaware litigation between the parties. The chancery court concluded there that necessary findings in the *in rem* proceedings could have collateral estoppel effect in subsequent *in personam* litigation between the same parties. It held that its decision as to majority share ownership of TCI in the *in rem* § 225 Action—precisely the issue as to which preclusion is sought here—prohibited relitigation of that issue in the *in personam* Fraud Action in Delaware. *See Technicorp Int'l II,* 1997 WL 538671, at *8. The chancery court's conclusion is consistent with what the Delaware Supreme Court has said on the subject. In *E.B.R. Corp. v. PSL Air Lease Corp.,* 313 A.2d 893 (Del.1973), that court noted that "[b]ankruptcy is an *in rem* proceeding and a party is free to withdraw from such litigation and abandon the *res.* ... [A] judgment in such a proceeding does not bind personally and is not conclusive as to a fact determined, *except between persons*

*who have actually litigated that factual question."* *Id.* at 894 n. 2 (emphasis added).[1] Under applicable Delaware law, then, contrary to the position taken by Johnston and Spillane, the determination of an issue actually litigated and decided against a defendant in an *in rem* case may have collateral estoppel effect in a subsequent *in personam* proceeding.

We also reject Johnston and Spillane's argument that because they appeared and participated in the § 225 Action in their capacity as "directors", collateral estoppel cannot be applied in this *in personam* action. Johnston and Spillane's roles as directors and shareholders of TCI II were inextricably linked. They had every incentive to, and in fact did, vigorously contest the issue of majority stock ownership in the § 225 Action. To support their claim that they were TCI II's lawful directors, Johnston and Spillane were required to establish that they, not Vendel and Arbitrium, held a majority of the shares. They failed to do so. Their federal court action is an attempt to get the proverbial second bite at the apple that collateral estoppel is designed to prevent.[2]

### B. Due Process

■ To be sure, where a defendant not subject to *in personam* jurisdiction does not appear or conduct *in rem* litigation, due process considerations may prevent another court from giving issues decided in the *in rem* proceeding, other than the defendant's interest in the property at issue, collateral estoppel effect.

In *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Supreme Court first held that courts may exercise *in personam* jurisdiction over out-of-state defendants only if the defendants have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* at 316, 66 S.Ct. 154 (internal quotation marks omitted). The minimum contacts "make it reasonable, in the context of our federal system of government, to require the [defendant[3]] to defend the particular suit which is brought" in the forum state. *Id.* at 317, 66 S.Ct. 154. To require a defendant without minimum contacts to appear and defend the action "has been thought to lay too great and unreasonable a burden on the [defendant] to comport with due process." *Id.*

■ If an *in rem* action is brought involving an out-of-state party's rights with respect to property in the forum state, on the other hand, the forum court ordinarily has the power to decide the case insofar as it affects those rights, irrespective of whether there are sufficient contacts to confer on the court *in personam* jurisdic-

1. The result would be the same under the law of the Second Circuit, which applies when we are not bound to apply state collateral estoppel law. Collateral estoppel may foreclose decision on an issue in an *in personam* lawsuit when that issue has previously been decided in an *in rem* action. In *Central Hudson,* this Court found that collateral estoppel applied to prohibit relitigation of an issue in an *in personam* action where the party, which had not been joined as a defendant, had had a full and fair opportunity to, and actually did, litigate that issue in a prior *in rem* proceeding. We stated that "[g]iven its control of and participation in the litigation, [the defendant] cannot seriously contend that it had no 'full and fair opportunity' to litigate." *Central Hudson,* 56 F.3d at 369. As in *Central Hudson,* Johnston and Spillane unquestionably

controlled the prior litigation on the issue of the ownership of a majority of TCI II's shares.

2. Our finding is in accord with the Restatement which states, "A person who is not a party to an action but who controls or substantially participates in the control of the presentation on behalf of a party is bound by the determination of issues decided as though he were a party." RESTATEMENT (SECOND) OF JUDGMENTS § 39 (1980).

3. The word used in *International Shoe* is "corporation," but *Shaffer v. Heitner,* 433 U.S. 186, 204 n.19, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), makes clear that the "standard [that *International Shoe*] ... set[] forth governed actions against natural persons as well as corporations."

tion over the party. *See Shaffer v. Heitner*, 433 U.S. 186, 207–08, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977). But, if such contacts are absent, the existence of *in rem* jurisdiction alone does not permit the forum court to require such a party to appear in the forum or actively defend his or her interest in the property. Forcing this burden upon a party without minimum contacts with the forum state is precisely what is forbidden by *International Shoe* as "offen[sive] to traditional notions of fair play and substantial justice." 326 U.S. at 316, 66 S.Ct. 154 (internal quotation marks omitted). Such a party has the due process right simply to decline to appear, although he or she may default on, or have to suffer a defense provided by others on, the *in rem* claim as a result.

Although a party who refuses to appear or defend an *in rem* action will be bound by the outcome of the litigation as to his or her interest in the property in question, decisions on other issues in the *in rem* proceedings cannot bind the party in subsequent *in personam* litigation. If they did, the only way such a party could avoid being forever foreclosed by the operation of collateral estoppel from litigating those issues on the merits would be for it to conduct the defense in the *in rem* action. Requiring the defendant thus to conduct litigation in the forum state in the absence of sufficient contacts to establish *in personam* jurisdiction is irreconcilable with the defendant's due process right to refrain from defending litigation there.

In *Minichiello v. Rosenberg*, 410 F.2d 106 (2d Cir.1968), *adhered to en banc*, 410 F.2d 117 (2d Cir.1969), we held constitutional a judicially created procedure that permitted a New York resident to bring an action in New York courts directly against an out-of-state person's insurance policy if the policy had been issued by a company with an office in New York. Under this procedure, the plaintiff simply named the insured as a nominal defendant and the New York insurance company as garnishee. A New York plaintiff was thereby able to recover in New York for injuries suffered in an out-of-state accident covered by the insurance policy, up to the limits of the policy.[4] We recognized, though, that the "whole theory behind this procedure is that it is in effect a direct action against the insurer and that the [insurer] rather than the insured will conduct the defense." *Id.* at 112. Because the insured individual defendant would not conduct the defense in the New York suit, we said, any attempt to use collateral estoppel in a second action in another forum that had *in personam* jurisdiction over the defendant would be inconsistent with due process. *See id.*

■ *Minichiello*, upon which Johnston and Spillane heavily rely, does not help them. In spite of the absence of minimum contacts with Delaware sufficient to confer *in personam* jurisdiction over them, they did not decline to conduct the defense of the § 225 Action in Delaware. They chose instead to participate in the § 225 Action and to have that defense conducted vigorously on their behalf. We therefore find nothing unfair or unjust about holding them to the results of the Delaware litigation. All of the reasons that underlie the doctrine of collateral estoppel—prevention of "expense and vexation attending multiple lawsuits, conserv[ing] judicial re-

---

4. Such so-called "Seider" actions, named after the case that first sanctioned their use, *Seider v. Roth*, 17 N.Y.2d 111, 216 N.E.2d 312, 269 N.Y.S.2d 99 (1966), were eventually held unconstitutional by the United States Supreme Court in *Rush v. Savchuk*, 444 U.S. 320, 100 S.Ct. 571, 62 L.Ed.2d 516 (1980). The *Rush* Court concluded, contrary to *Minichiello*, that "*Seider* actions are not equivalent to direct actions" against the insurer, and that *in personam* jurisdiction over the individual defendant was "analytically prerequisite to the insurer's entry into the case." *Id.* at 330–31, 100 S.Ct. 571. The Court held that there was no *in personam* jurisdiction over the individual defendant because "the fictitious presence of the insurer's obligation in [the forum state] does not, without more, provide a basis for concluding that there is any contact in the *International Shoe* sense between [the forum state] and the insured." *Id.* at 329–30, 100 S.Ct. 571.

sources, and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent decisions," *Montana,* 440 U.S. at 154, 99 S.Ct. 970 (footnote omitted)—counsel in favor of its application here. And due process does not forbid it.

### III. Whether the Chancery Court Had Adequate Subject–Matter Jurisdiction

■ Johnston and Spillane correctly note that in order for collateral estoppel to apply, the court rendering the initial determination must have had adequate jurisdiction. *See Baker v. General Motors Corp.,* 522 U.S. 222, 118 S.Ct. 657, 663–64, 139 L.Ed.2d 580, (1998) ("A final judgment in one State, *if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment,* qualifies for recognition throughout the land. For claim and issue preclusion (res judicata) purposes ... the judgment of the rendering State gains nationwide force." (emphasis added and footnote omitted)).

■ In an action pursuant to § 225 of the Delaware General Corporation Law, Delaware courts have "jurisdiction to authoritatively determine the validity of a claim by one claiming to hold office as a director of a Delaware corporation." *Steinkraus,* 1991 WL 3922, at *3. The purpose of a § 225 action "is to provide a quick method for review of the corporate election process .... [T]he Court of Chancery has consistently limited section 225 trials to narrow issues." *Box v. Box,* 697 A.2d 395, 398 (Del.1997). Johnston and Spillane argue that the chancery court was thus limited to determining the "narrow issue" of "the right to hold corporate office," and therefore did not have the ability to determine whether Vendel and Arbitrium held a majority of TCI II's shares.

Johnston and Spillane rely on *Rosenfield v. Standard Electric Equipment Corp.,* 83 A.2d 843 (Del.Ch.1951), where the chancery court declared that a predecessor statute to § 225 provided to courts the power to "decide who had the right to vote the stock in dispute" but not the power to make "a binding determination of ownership as between the conflicting claimants unless they are parties who have been served with effective process." *Id.* at 845. Johnston and Spillane assert that under *Rosenfield,* a chancery court deciding a § 225 action has no authority or jurisdiction to make a binding factual finding with respect to majority ownership.

But *Rosenfield* did not hold that the chancery court is without jurisdiction to make factual determinations with respect to stock ownership where such a determination is necessary to resolve the § 225 dispute. The decision stands instead for the narrower proposition noted by Vice Chancellor Jacobs in the Fraud Action that "an adjudication of ultimate title to (or voiding of) a party's stock is not a remedy available in a § 225 proceeding." *Technicorp Int'l II,* 1997 WL 538671, at *7.[5]

In this case, the chancery court was required to determine, under its § 225 powers,[6] who were the lawful directors of TCI II. That in turn depended on the validity of Vendel and Arbitrium's written consent, which purported to oust Johnston and Spillane as directors and name Vendel the sole director of TCI II. Under Delaware law,

---

**5.** *Rosenfield* was similarly construed in *Kahn Bros. & Co. v. Fischbach Corp.,* CIV.A. No. 8987, 1988 WL 122517, 1988 Del. Ch. LEXIS 147 (Del. Ch. Nov. 15, 1988). In *Kahn Bros.,* Chancellor Allen stated that while "ownership rights, as distinguished from voting rights, typically [will not] be adjudicated in [a § 225] proceeding [this] obviously do[es] not mean ... that issues that are necessary for decision of [the voting rights question] are not cognizable in a Section 225 action." 1988 WL 122517, at *5.

**6.** "[T]he Court of Chancery may hear and determine the validity of any election of any director, member of the governing body, or officer of any corporation, and the right of any person to hold such office." Del.Code Ann. tit. 8, § 225(a).

any action which may be taken at any annual or special meeting ... may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the actions so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.

Del.Code Ann. tit. 8, § 228(a). In this case, in order for the consent to have been valid, Vendel and Arbitrium must have executed it on behalf of a majority of all shares entitled to vote for directors. For the chancery court to perform its § 225 function of determining who was rightfully a director, it therefore had to resolve the issue of whether Vendel and Arbitrium owned a sufficient number of TCI II shares—here a majority—to execute the consent.

In resolving this issue in its final § 225 order, the chancery court did not purport to do that which *Rosenfield* prohibits—it did not enter an order granting Vendel legal title to any particular shares of stock. The chancery court's findings as to the majority ownership of TCI II shares, which it was competent to make, were necessary to the court's determination of the directorship question under § 225. The judgment of the chancery court, having been rendered on the basis of adequate subject matter jurisdiction, gained nation-wide force for collateral estoppel purposes, *see Baker,* 522 U.S. 222, 118 S.Ct. at 663–64, and may appropriately be enforced here.

## CONCLUSION

For the reasons set forth above, the district court's dismissal of Johnston and Spillane's complaint is affirmed.

1. See, e.g., the report of the June 17, 1994 proceedings by the Third Circuit dedicating

SHADUR, District Judge, dissenting:

Congress' codification of the Full Faith and Credit Clause in 28 U.S.C. § 1738 has mandated that we look to Delaware law, not to what in some limited areas has become labeled as "federal common law," for the preclusive effect (if any) to be given to what was said and done in the earlier Delaware Chancery in rem proceedings that involved Technicorp International II, Inc. ("TCI II")(but neither H. Frederick Johnston nor Sandra Spillane) as a party litigant. That is the message that was definitively conveyed by the Supreme Court in *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 84 L.Ed.2d 274 (1985) and adhered to by this Court in *Valley Disposal, Inc. v. Central Vermont Solid Waste Management Dist.,* 31 F.3d 89, 98–99 (2d Cir.1994).

In this instance there has been no decision from the Delaware Supreme Court answering an analytical question that must be recognized to be at least arguable on both sides of the issue. Instead we have some expressions from lower courts in Delaware's judicial firmament, on the Chancery side of the docket, that themselves can (at a minimum) be said to look in both directions. Indeed, the judge who was in all likelihood the most respected Chancellor in this century's Delaware jurisprudence, the late Collins Seitz (who was later to become a distinguished federal Circuit Judge—and Chief Judge—of the Third Circuit[1]), has spoken of an 8 Del.C. § 225 action (the type of in rem proceeding involved here) as "not of course constitut[ing] a binding determination of ownership as between the conflicting claimants" to stock ownership because "process was neither prayed for nor issued which would permit this Court to pass upon the ownership of the shares in dispute" (Rosenfield v. Standard Elec. Equip. Corp., 83 A.2d 843, 845 (Del.Ch.1951)).

the Collins J. Seitz Courtroom, reported at 35 F.2d LXXIIII–XCI.

Now it may well be that the majority's thoughtful analysis in this case is a sound guess as to how the matter would be resolved by the Delaware Supreme Court if it were given the opportunity to do so. But by its very nature that analysis is no more than a guess. And it surely cannot be gainsaid that the Delaware Supreme Court could just as well choose to follow the opposite (and majority) path—the teaching of the extensive caselaw that has been embodied in Restatement (Second) of Judgments ("Restatement") § 36(2)(1982):

A party appearing in an action in one capacity, individual or representative, is not thereby bound by or entitled to the benefits of the rules of res judicata in a subsequent action in which he appears in another capacity.

In that respect, it is also significant that Restatement § 39, which addresses the "control of litigation" or "incentive to contest" principle of preclusion that is relied on by the majority opinion, expressly speaks of the principle set out in Restatement § 36 as an exception to that notion (Restatement § 39 cmt. *e*). Accord on both scores, 18 Charles A. Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice & Procedure: Jurisdiction* § 4451, at 436 & n.30 (1981 and 1999 supp.), with the 1999 supp. finding "puzzling" (and inconsistent with the Restatement's approach) this Court's decision in an admiralty in rem context in *Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa, S.A.*, 56 F.3d 359, 367–69 (2d Cir.1995).

Even as an effort at prediction, then, the majority opinion on that controlling issue swims against the tide of prevailing authority as reproduced in the Restatement. Nor are federal courts necessarily possessed of an unclouded crystal ball in carrying out their predictive role as to how state courts will deal with state law questions. In my own circuit I recall an instance in which the Court of Appeals, undertaking the same attempted predictive function under *Erie v. Tompkins*, perpetuated an error in announcing and applying the Illinois law of piercing the corporate veil for over 20 years before it had to confess error in that respect, based on principles that the Illinois state courts had announced instead (see *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 570–71 (7th Cir.1985), disavowing *Steven v. Roscoe Turner Aeronautical Corp.*, 324 F.2d 157 (7th Cir.1963) and the intervening cases that had followed the lead of the latter).

There is of course an obvious alternative to what the majority had done here: Let the Delaware courts decide Delaware law. In that regard *Wilton v. Seven Falls Co.*, 515 U.S. 277, 115 S.Ct. 2137, 132 L.Ed.2d 214 (1995) has unanimously rejected the "exceptional circumstances" test by which *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) and *Moses H. Cone Mem. Hosp. v. Mercury Const. Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) could have inhibited a district court's power to abstain in a declaratory judgment action during the pendency of parallel state court proceedings. That of course is precisely the context here, for what the parties have referred to as the Fraud and Waste Action was pending in the Delaware state court system when this declaratory judgment action was instituted in the federal district court.

To be sure, *Wilton*, 515 U.S. at 288, 115 S.Ct. 2137 also said that the district court's decision to stay or to dismiss a declaratory judgment action was to be made "in the second exercise of its discretion."[2] But in

2. Both that statement and each of *Wilton*'s other references to a district court's discretion were made in the context of the Supreme Court's rejecting the views of several Courts of Appeals that had held that no such discretion existed—that they simply could not defer to state courts absent "extraordinary circumstances." And *Wilton*'s only discussion of the factors to be considered by a district court in deciding on abstention (515 U.S. at 282–83, 115 S.Ct. 2137) points strongly and directly toward abstention in this case.

this instance I suggest that no *sound* reason existed for the district court's contrary refusal to abstain, as was alternatively sought by plaintiffs–appellants.

This was not after all a situation in which the litigants would have to begin afresh in the state court system, so that any potential of a material delay in the resolution of the parties' controversy could be placed on the scales in opposition to abstention. Quite to the contrary, there was ongoing active in personam litigation in the Delaware state court (the Fraud and Waste Action) that squarely presented the opportunity to decide the question of plaintiffs–appellants' stock ownership in TCI II. No identifiable jurisprudential considerations called for the district court to embark on the uncharted seas (uncharted in terms of controlling precedent) of such arcane areas of Delaware law. Under the circumstances, then, I believe that the only sound and appropriate exercise of the district court's discretion was indeed to dismiss the federal action in favor of allowing the state law in this complex area (including the complex preclusion questions) to be decided, as it ought to be, by the state courts (something that would in all likelihood have been completed by now had the litigants' energies not been deflected by these federal proceedings).

One final note of irony should be sounded, especially in light of the pending Delaware litigation. By reaching the merits here, the majority have announced a judgment that presumably must itself be given preclusive effect in the pending Delaware Fraud and Waste Action.[3] So that means that the Delaware state courts (including the highest of those courts) will be compelled in this dispute to follow a federal court's guess as to Delaware law even if, left to its own devices, the Delaware Supreme Court would have come out differently.

Elsewhere I have confessed to being no great fan of *Erie v. Tompkins*, which has relegated the federal courts to second class citizenship in shaping the common law, rather than their pronouncing "the supreme Law of the Land" as I believe Article VI of the Constitution (properly understood) prescribes.[4] But *Erie* is too well entrenched to permit reexamination, and I believe that the result reached here—by forcing the state courts' reading of state law—turns the *Erie* doctrine of the federal courts' compelled adherence to state law on its head. It creates, I suggest, a potential for ultimate unfaithfulness to the Full Faith and Credit Clause and to its implementing Section 1738.

In sum, I would dismiss this action on abstention grounds, leaving the resolution of these intricate state law questions to the Delaware state courts. Accordingly I respectfully dissent.

---

**3.** If this is wrong, if the result reached here is *not* viewed by the Delaware state courts as binding, we will have engaged in truly empty efforts (which would be the ultimate irony).

**4.** See my article, *Are Federal Courts Necessary?*, 18 Loy.U.Chi.L.J. 1, 8–14 (1986).