# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BOLD ST. PETERS, L.P., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2024-0653-MTZ |
| | ) | |
| BOLD ON BOULEVARD LLC, | ) | |
| RCG BOLD GP LLC, BOLD | ) | |
| APARTMENTS LLC, RCG BOLD | ) | |
| 1 LLC, RCG BOLD 2 LLC, RCG | ) | |
| BOLD 3 LLC, RCG BOLD 4 LLC, | ) | |
| RCG BOLD 5 LLC, and | ) | |
| NACHMAN Y. TEREN, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 30, 2024
Date Decided: November 19, 2024

Jesse L. Noa, Charles R. Hallinan, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Aaron L. Casagrande, Michael P. Collins, Jr., Aaron A. Nichols, ICE MILLER LLP, Baltimore, MD; John D. French, ICE MILLER LLP, Indianapolis, IN, *Attorneys for Plaintiff Bold St. Peters, L.P.*

Steven L. Caponi, Michael J. Vail, K&L GATES LLP, Wilmington, DE; Kartik R. Singapura, Nathan Cox, Mason G. Jones, Laura K. Lavernia, BELL NUNNALLY & MARTIN LLP, Dallas, TX; *Attorneys for Defendants Bold On Boulevard LLC, RCG Bold GP LLC, Bold Apartments LLC, RCG Bold 1 LLC, RCG Bold 2 LLC, RCG Bold 3 LLC, RCG Bold 4 LLC, RCG Bold 5 LLC, and Nachman Y. Teren.*

**ZURN, Vice Chancellor.**

This expedited post-trial opinion concludes the plaintiff validly removed one of the defendants as manager of a limited liability company in which they are both members. But it denies the plaintiff's request to broadly declare as void every action the removed defendant took after removal, and it declines to grant interim fees.

## I.   BACKGROUND[1]

Plaintiff Bold St. Peters, L.P. ("Plaintiff" or "PE Member") has the burden of proving its claim under Section 18-110 of Delaware's Limited Liability Company Act[2] by a preponderance of the evidence.[3] The two-day trial on that claim featured eight live witnesses and over five hundred joint exhibits. The following facts were stipulated to by the parties or proven by a preponderance of the evidence at trial.

### A.   PE Member And Common Member Agree To Temporary Powersharing Over The Property.

In 2022, PE Member finished building a 272-unit apartment complex in St. Peters, Missouri (the "Property").[4] PE Member agreed to sell the Property to nonparty Silverstone Management, LLC, an affiliate of defendant RCG Bold GP

---

[1] Citations in the form "[last name] Tr. –" refer to trial testimony of the referenced witness, available at docket item ("D.I.") 126 and D.I. 127. Citations in the form "PTOB" refer to the plaintiff's post-trial opening brief, available at D.I. 124. Citations in the form "PTAB" refer to the defendants' post-trial answering brief, available at D.I. 128. Citations in the form "PTRB" refer to the plaintiff's post-trial reply brief, available at D.I. 130.

[2] 6 *Del. C.* § 18-110.

[3] *Lynch v. Gonzalez*, 2020 WL 4381604, at *30 (Del. Ch. July 31, 2020), *aff'd*, 253 A.3d 556 (Del. 2021).

[4] D.I. 100 at ¶¶ 7, 15 [hereinafter "PTO"].

LLC ("Common Member").[5]  Under the original terms of sale, Silverstone Management was to purchase 100% ownership in the Property.[6]  But the deal was modified, and PE Member retained a $15,000,000 preferred equity position.[7]  Defendant Bold on Boulevard, LLC (the "Company") was created to purchase the Property.[8]  Silverstone Management assigned its purchase rights to the Company, and the Company's purchase of the Property closed on December 30, 2022.[9]

The Company financed the purchase via PE Member's investment and a loan from Old National Bank ("ONB" and the "ONB Loan"), which would mature and be payable on December 31, 2024 and January 1, 2025, respectively.[10]  The ONB Loan included an agreement to maintain compliance with certain debt service coverage ratio ("DSCR") and interest only debt service coverage ratio ("IODSCR") financial covenants.[11]  ONB would test the DSCR and IODSCR covenants quarterly.[12]

The Company is governed by an operating agreement dated December 30,

---

[5] *Id.* ¶¶ 16–18.

[6] *Id.* ¶ 19.

[7] *Id.* ¶ 21.

[8] *Id.* ¶ 20.

[9] *Id.* ¶¶ 23–24.

[10] *Id.* ¶¶ 26–28; JX 186 at 143; Teren Tr. 416.

[11] JX 131 § 5.01(n).

[12] *Id.*

2022 (the "Operating Agreement").[13] Through the Operating Agreement, Common Member was appointed the Company's managing member.[14] The Operating Agreement constrained Common Member's managerial rights with consent rights for PE Member, and circumstances under which PE Member could remove Common Member as manager and become manager itself.

Relevant here, PE Member had to provide prior written consent for material amendments to the ONB Loan.[15] The Operating Agreement established PE Member's consent "unless otherwise stated, may be withheld or conditioned in such Member's sole discretion."[16] Specifically as to consent regarding the ONB Loan, "PE Member has an absolute independent right to grant, deny, withhold or condition any requested consent or approval based on its own point of view, but subject to the standards of consent set forth herein and the implied covenant of good faith and fair dealing."[17]

Any event defined as a "Removal Event of Default" would trigger PE

---

[13] JX 186 [hereinafter "OA"].

[14] *Id.* § 7.2(a). Defendant Nachman Y. Teren is Common Member's managing member. PTO ¶ 14.

[15] OA § 9.2(f); *see also id.* § 9.3(g) (addressing material and adverse changes to the ONB Loan).

[16] *Id.* § 1.2(a)(iii).

[17] *Id.* § 9.3(i).

Member's right to replace Common Member as managing member.[18]  A default under the ONB Loan is a Removal Event of Default.[19]  Upon a Removal Event of Default, PE Member could initiate a change in control by sending Common Member a notice of default and an opportunity to cure.[20]  The cure period varied based on the type of default.  A default under the ONB Loan's DSCR or IODSCR covenants afforded Common Member a fifteen-day cure period.[21]  Upon expiration of the cure period without a cure, PE Member could effectuate a change in control by sending a change in control notice.[22]  Once PE Member effectuated a change in control, Common Member was obligated to cooperate with the transition in good faith.[23]

One more set of provisions is relevant here.  PE Member, Common Member, and the Company agreed to feeshifting provisions in the Operating Agreement and in a guaranty agreement between PE Member and the Company.[24]

---

[18] *Id.* § 7.2(b).

[19] *Id.* § 15.1(d); *see* PTO ¶ 58.

[20] OA § 7.2(b).

[21] *Id.*

[22] *Id.*

[23] *Id.* § 7.3.

[24] *Id.* § 17.4 (requiring the Company to pay or reimburse PE Member "for all reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred by PE Member in connection with . . . prosecuting or defending of any action . . . in each case against, under or affecting Common Member, this [Operating Agreement] or . . . the Company"); *id.* ("In the event . . . of a Control Event . . . Company shall be chargeable with and agrees to pay all costs incurred by PE Member as a result thereof . . . including reasonable attorneys' [fees] . . . ."); JX 154 § 2.2 (requiring the Company to pay "all costs

4

### B. The Company Defaults On The ONB Loan.

In an October 2023 email, ONB informed the Company it failed the IODSCR covenant as tested on June 30, 2023 and September 30, 2023.[25] Without PE Member's knowledge, ONB and the Company discussed potential cures for the defaults.[26] On April 12, 2024, ONB sent a proposed loan modification agreement to Common Member.[27] If the modifications were implemented, ONB agreed to waive the June 2023 and September 2023 defaults.[28] Common Member did not inform PE Member about the proposed loan modifications.[29] And in an attempt to keep PE Member in the dark, Common Member asked ONB to paper the loan modification without requiring PE Member's signature, even though the Operating Agreement requires PE Member's consent.[30]

The ONB Loan was not amended, and on May 9, ONB issued a formal notice

---

and expenses of any kind which PE Member may at any time pay or incur in successfully attempting to collect, compromise or enforce in any respect its rights under the [Operating Agreement] or this Agreement including, without limitation, all attorneys' fees, court costs, and other legal expenses, whether or not suit is ever filed, and whether or not in connection with any insolvency, bankruptcy, reorganization, arrangement or other similar proceeding involving Common Member, [or] the Company").

[25] JX 331 at 7.

[26] *See, e.g.*, JX 298; JX 355; JX 357; JX 358; JX 373; Kavourias Tr. 45.

[27] JX 373.

[28] *Id.* at 3.

[29] Kavourias Tr. 45.

[30] JX 382 at 2; Yeshua Tr. at 307–08; OA § 9.2(f); *id.* § 9.3(g).

of default based on the Company's failure to satisfy the IODSCR covenant in ONB Loan Section 5.01(n)(ii), as tested on June 30, 2023 and September 30.[31] As the ONB Loan required, ONB delivered that notice to PE Member as well; Common Member had still not informed PE Member about the proposed loan modification amendments for the defaults.[32] On May 16, PE Member and Common Member discussed a potential amendment to the ONB Loan but reached no agreement.[33] Instead, on May 23, PE Member sent a letter to Common Member stating the May 9 defaults "constitute an Event of Default under Section 15.1(d) of the Operating Agreement."[34] The May 23 letter does not reference the Operating Agreement's change in control provision or Common Member's right to cure.[35] Common Member and PE Member continued to discuss a potential amendment to the ONB Loan.

But defaults under the ONB Loan continued to accrue. The Company failed the IODSCR covenant set forth in ONB Loan Section 5.01(n)(ii) as tested on December 31, 2023, and the DSCR covenant set forth in Section 5.01(n)(i) as tested on March 31, 2024 (the "Defaults").

---

[31] PTO ¶ 47.

[32] JX 131 § 9.04; JX 380 at 2 (carbon copying PE Member).

[33] PTO ¶ 54.

[34] JX 385.

[35] *Id.*

On June 4, Common Member provided PE Member copies of ONB's suggested loan modification documents for the first time.[36] The proposed amendments included modifications to the Section 5.01(n)(i) DSCR covenant.[37] The original covenant required the Company maintain a DSCR of not less than 1.20:1.00, tested quarterly on a trailing three month basis.[38] The modifications briefly lowered the ratio to 1.05:1.00 for June 2024, on a trailing six month basis, 1.10:100 for September 30, on a trailing nine month basis, and then back to 1.20:1.00 for December 31, but on a trailing twelve month basis.[39] The Company would also have to deposit a $550,000 cash collateral into escrow to secure its ongoing obligations with ONB.[40] Under the proposed amendment, ONB would use the $550,000 to adjust the Company's net operating income upwards, increasing the Company's chance of meeting the DSCR and IODSCR covenants.[41]

On or around June 10, PE Member's counsel told Common Member's counsel the proposed loan modifications were not a sufficient remedy because while they

---

[36] JX 388; Kavourias Tr. 46–47.

[37] JX 373 at 5.

[38] JX 131 § 5.01(n)(i). The IODSCR covenant required a ratio of not less than 1.00:1.00 on a trailing three month basis. *Id.* § 5.01(n)(ii).

[39] JX 373 at 5.

[40] *Id.* at 4; Yeshua Tr. 314–15.

[41] Stein Tr. 355–62; JX 355; JX 358. Net operating income is the numerator in DSCR calculations. Stein Tr. 357–58.

7

waived the June and September 2023 defaults, they did not waive the December 2023 and March 2024 Defaults.[42] PE Member also believed future defaults remained likely even under the adjusted covenants.[43] PE Member feared the Property's poor performance would preclude the Company from passing even the modified DSCR ratios.[44] PE Member was similarly concerned with the extended trailing period: even if the Property started to perform better, the longer lookback period would drag the Property's past poor performance into the calculation.[45] On June 11, ONB confirmed PE Member's concern: the modifications "only address[ed] the past two DSCR violations for June and September 2023" and did not "address any future defaults, or any missed future covenants within the proposed modification."[46]

### C. The Company Defaults Again And PE Member Removes Common Member.

On June 28, ONB issued a second formal notice of default to the Company as a result of the December 2023 and March 2024 Defaults.[47] The June 28 notice advised that while ONB was raising the interest rate due to the Defaults, ONB would

---

[42] JX 373 at 2; Yeshua Tr. 309–10.

[43] Kavourias Tr. 47; Detzler Tr. at 156–57; *see also* Yeshua Tr. 344; JX 373 at 3.

[44] Detzler Tr. at 156–57.

[45] Kavourias Tr. 48–49.

[46] JX 395 at 2–3.

[47] PTO ¶ 55; JX 397.

"forbear from exercising any additional remedies" until July 26 to give Common Member and PE Member additional time to resolve the defaults, if: (1) Common Member "continues to make its regularly scheduled payments," (2) Common Member and PE Member execute a "Pre-Discussion Letter and return it to [ONB] on or before July 19, 2024," (3) a meeting is scheduled with Common Member, PE Member and ONB before July 26, and (4) no other defaults occur.[48]

Due to ONB's notice of default, the Defaults comprise a Removal Event of Default under Operating Agreement Section 15.1(d).[49] PE Member began implementing the Operating Agreement's steps for a change in control upon a Removal Event of Default. On July 2, PE Member sent Common Member a supplemental notice of default based on the Defaults (the "PE Member Default Notice").[50] The PE Member Default Notice demanded the Common Member cure the Defaults within fifteen days.[51]

On July 10, PE Member and Common Member executed the Pre-Discussion Letter ONB had requested as a condition of forbearance on additional default

---

[48] JX 397 at 2.

[49] PTO ¶ 58.

[50] *Id.* ¶ 57; JX 401. Common Member acknowledged the PE Member Default Notice was a notice to cure under Section 7.2. JX 415 at 1; D.I. 133 at 109–10.

[51] JX 401 at 3; OA § 7.2(b).

remedies.[52]

On July 17—the fifteenth day of the fifteen-day cure period—Common Member responded (the "Common Member Response").[53] The Common Member Response acknowledged that "Section 7.2 of the Operating Agreement provides Common Member 15 days from the date of PE Member's Notice to cure before PE Member may demand a Change in Control."[54] The Common Member Response stated Common Member cured the Defaults by entering into the Pre-Discussion Letter.[55] It argued that due to ONB's forbearance from exercising additional remedies, no event of default was ongoing and so PE Member could not exercise any remedies.[56] The Common Member Response closed by stating Common Member was ready to execute the loan modification documents to cure the Defaults, but that PE Member "refuses and continues to refuse to provide consent to the loan modification."[57]

---

[52] JX 415 at 1.

[53] *Id*. The Common Member Response was not referenced at trial or in any pre- or post-trial briefing, nor does it include a transmittal email or other proof of delivery. Instead, PE Member pointed to Common Member's July 23 letter as a late offer to cure. PTRB 13. The parties have not objected to the Common Member Response's authenticity or to my characterization of it. *See* D.I. 117; D.I. 133 at 15, 110.

[54] JX 415 at 1.

[55] *Id*.

[56] *Id.*

[57] *Id.* at 2.

On July 23, after the fifteen-day cure period had expired, Common Member wrote PE Member requesting its consent to the loan modifications and summarizing the material amended terms.[58] PE Member responded on July 25 with questions about the proposed amendments.[59] PE Member stated it "would consent to limited loan modifications, provided that Common Member consents to a change in control for the Company."[60]

Negotiations ended on July 30, when PE Member delivered a change in control notice to Common Member under Operating Agreement Section 7.2(c)(ii) (the "Change in Control Notice").[61] PE Member stated it was removing Common Member as managing member of the Company, and appointing itself, in accordance with Section 7.2(b).[62] But Common Member has taken no steps to facilitate a change in control to PE Member.[63]

---

[58] JX 416.

[59] JX 417. The trial record contains no response by PE Member to the Common Member Response. *See* D.I. 117.

[60] JX 417 at 3.

[61] JX 418.

[62] *Id.* at 1–2.

[63] PTO ¶ 61.

### D. Litigation Ensues.

PE Member initiated this litigation on June 14, 2024, and amended its complaint on August 30 (the "Amended Complaint").[64] The amended complaint contains eight counts. Only Count I, requesting declaratory relief under 6 *Del. C.* § 18-110 against Common Member and the Company, was tried on an expedited basis. In Count I, PE Member requests I order that: (i) PE Member is entitled to remove and replace Common Member as the managing member of the Company; (ii) PE Member validly removed Common Member as the managing member of the Company; (iii) PE Member validly appointed itself as the managing member of the Company; and (iv) any action taken by Common Member on behalf of the Company as managing member following its removal is void and of no legal effect.[65] PE Member and Common Member both request fees. Trial was held on October 8 and 9; post-trial briefing followed, and post-trial argument was held on October 30.[66] This is my post-trial decision.

## II. ANALYSIS

PE Member effectuated a change in control of the Company through the

---

[64] D.I. 1; D.I. 43.

[65] D.I. 43 ¶¶ 80–93.

[66] D.I. 132.

Change in Control Notice.[67]  Common Member was removed, and PE Member validly appointed itself manager under the Operating Agreement.  I stop short of broadly declaring any action taken by Common Member after its removal as void unless ratified.  And as there are other related counts still pending, I stop short of granting interim fees.

### A.  PE Member Effectuated A Change In Control.

Pursuant to 6 *Del C.* § 18-110, "[u]pon application of any member or manager, the Court of Chancery may hear and determine the validity of any admission, election, appointment, removal or resignation of a manager of a limited liability company, and the right of any person to become or continue to be a manager of a limited liability company."[68]  "A proceeding under Section 18-110(a) 'is summary in character, and its scope is limited to determining those issues that pertain to the validity of action to elect or remove' a manager."[69]  PE Member claims it properly effectuated a change in control under the Operating Agreement.  I agree.

#### 1. The Company Defaulted And PE Member Provided Notice.

---

[67] Count I of the Amended Complaint requests the Court find PE Member "validly removed Common Member as the Managing Member of the Company on April 8, 2024, and subsequently again thereafter."  D.I. 43 at 30.  Despite Count I's focus on April 8 as a starting point, the July 30 change in control was pled in the amended complaint, *see generally* D.I. 43 at ¶¶ 77–79, and was tried at trial without objection.

[68] 6 *Del. C.* § 18-110(a).

[69] *Llamas v. Titus*, 2019 WL 2505374, at *15 (Del. Ch. June 18, 2019) (quoting *Genger v. TR Invs., LLC*, 26 A.3d 180, 199 (Del. 2011)).

"Delaware's LLC law is . . . 'explicitly contractarian,' and fundamentally regards and enforces the limited liability company agreement as a contract."[70] The starting point of my analysis is the Operating Agreement, and in particular Section 7.2's requirements for notice, a cure period, and a change in control. "Courts in our State and beyond have recognized that contractual notice and cure provisions cannot be ignored . . . ."[71] Indeed, "Delaware law requires compliance with notice and cure provisions."[72]

Section 7.2 of the Operating Agreement prescribes how PE Member can effectuate a change in control. It provides:

> At any time after the PE Member learns of the occurrence of a Removal Event of Default after giving the Common Member 30 days' written notice to cure (except in the case of a Removal Event of Default triggered by Section 15.1(d) which shall be subject to only a 5 day written notice to cure for monetary and a 15 day written notice to cure for non-monetary events of default relevant to Section 15.l(d)), PE Member may terminate Common Member's authority to act as Managing Member, and subject to Section 7.2(c) below, PE Member or a Person designated by PE Member shall thereupon become the Managing Member and shall thereafter have all of the rights and prerogatives hereunder as Managing Member (such event a "Change in

---

[70] *In re Coinmint, LLC*, 261 A.3d 867, 890 (Del. Ch. 2021) (quoting *Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*, 2014 WL 108895, at *1 (Del. Ch. Jan. 13, 2014)).

[71] *Cornell Glasgow, LLC v. LaGrange Props., LLC*, 2012 WL 6840625, at *13 (Del. Super. Ct. Dec. 7, 2012).

[72] *Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *39 (Del. Ch. Apr. 30, 2021); *accord AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, WL 7024929, at *82 (Del. Ch. Nov. 30, 2020), *aff'd*, 268 A.3d 198 (Del. 2021) ("Compliance with a notice requirement is not an empty formality.").

14

Control"), at any time after the PE Member learns of the occurrence of a Removal Event of Default.[73]

Section 7.2(c) goes on, in relevant part:

A Change in Control shall be effective upon satisfaction of the following condition[]: . . . PE Member delivers to Common Member written notice that declares that PE Member is removing Common Member as Managing Member in accordance with Section 7.2(b) and appointing itself or a Person designated by PE Member as the Managing Member.[74]

Under Section 7.2(b), PE Member has the right to terminate Common Member's authority to act as managing member after learning of a Removal Event of Default, and after giving written notice to cure of the contractually specified duration.[75] Once the cure period runs, Section 7.2(c) provides PE Member's change in control is effective upon delivery of a written change in control notice.[76]

Section 7.2(b) was satisfied. PE Member learned of a Removal Event of Default when it learned of the Defaults from ONB on June 28.[77] PE Member gave

---

[73] OA § 7.2(b).

[74] *Id.* § 7.2(c)(ii). Section 7.2(c) also requires "the prior consent of the Mortgage Lender to the extent required under the Mortgage Loan, with the support and cooperation of the Common Member." *Id.* § 7.2(c)(i). No party contends ONB's consent was required here.

[75] *Id.* § 7.2(b).

[76] *Id.* § 7.2(c); *see* JX 415 at 1 ("Section 7.2 of the Operating Agreement provides Common Member 15 days from the date of PE Member's Notice to cure before PE Member may demand a Change in Control.").

[77] JX 401 at 3; PTO ¶ 55. Again, Defendants concede the Defaults comprise a Removal Event of Default. PTO ¶ 58. The trial record contains defaults predating the Defaults, and notices from PE Member predating the PE Member Default Notice. But the parties dispute

15

written notice to cure with the July 2 PE Member Default Notice, which included the requisite "15 day written notice to cure."[78]

Common Member has not argued in this litigation that it cured the Defaults within the fifteen-day cure period. The Common Member Response stated it had cured the Defaults by entering into the Pre-Discussion Agreement.[79] Common Member did not press this position at trial, and for good reason. ONB offered the Pre-Discussion Agreement as a condition to forbearance of additional remedies, not as a cure for the Defaults.[80]

The Common Member Response also stated ONB and Common Member were willing to execute the loan modification documents to cure the Defaults,[81] even though the modifications would only cure the June 2023 and September 2023 defaults.[82] The most Common Member could do on the fifteenth day of the cure

the effectiveness of those earlier notices. The Defaults, PE Member Default Notice, and Common Member Response satisfy Section 7.2, and PE Member has offered no reason why I must reach those earlier iterations.

[78] JX 401 at 3 (demanding Common Member "cure the Event of Default within fifteen (15) days from delivery of this letter to the Company and Common Member"); OA § 7.2. Defendants concede the PE Member Default Notice contained the requisite notice and cure period. D.I. 133 at 109–10.

[79] JX 415 at 1.

[80] JX 397 at 2. Common Member also did not press at trial the Common Member Response's statement that forbearance precluded PE Member from exercising a change in control. *See* JX 415 at 1.

[81] JX 415 at 2.

[82] JX 388 at 12.

period was state it was ready to execute those documents, and bemoan that PE Member was continuing to refuse to consent.[83] The loan modification documents were not executed within the fifteen-day cure period. Common Member did not cure the defaults within the cure period. Section 7.2(b)'s second requirement was met as of July 17.

From there, PE Member satisfied Section 7.2(c)'s condition: it sent the written change in control notice on July 30.[84] Common Member makes no argument this notice did not satisfy Section 7.2(c). PE Member properly effectuated a change in control under the Operating Agreement.

### 2. PE Member Was Within Its Rights To Withhold Consent To The Loan Modifications.

Common Member argues vociferously that it negotiated loan modifications in an attempt to cure the defaults, and that PE Member refused to consent in a manner that breached the Operating Agreement's express and implied terms.[85] Common Member's argument has two shortcomings: Common Member did not explicitly

---

[83] JX 415 at 2; Kavourias Tr. 44.

[84] JX 418.

[85] PTAB 28–32.

17

offer the modifications as a cure in time to effectuate them, and PE Member was within its rights to withhold consent for the reasons it had expressed to date.

Common Member did not effectuate the loan modifications within the fifteen-day cure window. Far from it. The Common Member Response on the fifteenth day did not actually offer the modifications as a cure; it just complained PE Member had not yet consented. The record is devoid of any discussions about loan modifications or PE Member's consent during the fifteen-day window.[86] The record shows PE Member refused to consent on or around June 10, before the Defaults and therefore the fifteen-day period,[87] and on July 25, after the fifteen-day period closed.[88] The only relevant activity during that period appears to be Common Member's entry into the Pre-Discussion Agreement with ONB, which as explained went to ONB's forbearance rather than a cure.

I could consider the evidence of PE Member's refusal to give consent before the fifteen-day cure period closed as tending to show that PE Member effectively refused to consent during the fifteen-day window, and therefore precluded Common Member from curing. Common Member has not made this precise argument, perhaps because Common Member did not elicit the Common Member Response at

---

[86] If discussions did occur, I am unaware of their content.

[87] Kavourias Tr. 47; Detzler Tr. at 156–57.

[88] JX 417. The trial record contains no PE Member response to the Common Member Response. *See* D.I. 117.

trial. This exercise would lead me to the parties' dispute over the standard governing PE Member's exercise of consent, and whether PE Member improperly refused to consent. Applying the preponderance of the evidence at trial to the plain language of the Operating Agreement leads to the conclusion that PE Member would have been within its rights to withhold consent during the fifteen-day window, such that it would not have improperly frustrated the loan modifications as a cure.[89]

The Operating Agreement expressly preserved for PE Member the freedom to withhold consent to loan modifications in its self-interest.[90] According to Section 1.2(a)(iii), PE Member can grant or withhold consent "in such Member's sole discretion," unless stated otherwise.[91] According to Section 9.3(i), which speaks specifically to consent to ONB Loan modifications, "PE Member has an absolute independent right to grant, deny, withhold or condition any requested consent or approval based on its own point of view, but subject to the standards of consent set

---

[89] The parties offered little clarity on how to apply Section 7.2 in the context of a cure that requires PE Member's consent to effectuate. Section 7.2 does not mention consent. Reading its plain text in isolation supports a mechanical application by which Common Member's failure to cure within the cure period, for any reason at all, gives PE Member the right to terminate Common Member's control. Under that reading, Common Member's remedy might be a breach of contract claim for withholding consent in violation of the Operating Agreement. Or, one could read Section 7.2 together with provisions governing consent to the cure, which might condition PE Member's termination right on its compliance with the consent standard. Because I conclude PE Member was within its rights to withhold consent, I do not reach this issue.

[90] *Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, at \*6 (Del. Ch. July 23, 2010).

[91] OA § 1.2(a)(iii).

19

forth herein and the implied covenant of good faith and fair dealing."[92]  Other

provisions state PE Member's consent cannot be "unreasonably withheld," but not

Section 9.3.[93]  In conjunction, Section 1.2 and Section 9.3 provide PE Member the

right to withhold approval in its sole discretion, independently, and based on its own

point of view, so long as it comports with the implied covenant.[94]  By this standard,

PE Member "retained the freedom not to give approval to a [loan modification] if it

did not view such a request as being in [PE Member's] own commercial interests."[95]

Common Member makes two attempts to elevate or alter PE Member's

consent standard.  First, it points to Section 9.3(i)'s express language invoking the

implied covenant.  That language is curious.  Of course, the implied covenant is

omnipresent: one need not speak its name, even once, to make it appear.[96]  "This

implied covenant 'inheres in every contract' and requires that contracting parties

---

[92] *Id.* § 9.3(i).

[93] *E.g.*, *id.* § 9.1(i) ("All [property operating agreements] and all renewals, amendments, terminations, waivers and modifications thereof executed after the Closing Date shall be subject to PE Member's prior approval not to be unreasonably withheld or delayed."); *see Related Westpac*, 2010 WL 2929708, at *6 (explaining that where some consent provisions have a reasonableness modifier and others do not, the provisions without that modifier are not cabined by reasonableness).

[94] *Related Westpac*, 2010 WL 2929708, at *6.

[95] *Id.*

[96] *C.f.* BEETLEJUICE (Warner Brothers 1988); *see Kelly v. Blum*, 2010 WL 629850, at *13 (Del. Ch. Feb. 24, 2010) ("Under the LLC Act, the contracting parties to an LLC agreement may not waive the implied covenant of good faith and fair dealing."); *see 6 Del. C.* § 18-1101(c) ("[T]he limited liability company agreement may not eliminate the implied contractual covenant of good faith and fair dealing.").

'refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party from receiving the fruits of the contract.'"[97]  I interpret Section 9.3(i)'s express invocation of the implied covenant to expressly subject PE Member's consent right to the implied requirement to refrain from arbitrary or unreasonable conduct that would deprive Common Member of the benefit of its bargain.  If there were any question that the implied covenant applies in any given situation, that express invocation makes plain it does.  But this language does not raise the bar above where the implied covenant is already set.

Second, Common Member argued PE Member could not withhold consent unreasonably.  Not so.  The Operating Agreement does not place a reasonableness condition on PE Member's discretion in approving ONB Loan modifications.  "A court should not read a reasonableness requirement into a contract entered into by two sophisticated parties"[98] nor "imply an obligation inconsistent with the parties' express agreement."[99]  Indeed, "[t]he fact that [PE Member's] obligation to give consent in other situations was qualified by the commonplace 'which shall not be

[97] *Kelly*, 2010 WL 629850, at *13 (quoting *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 887 (Del. Ch. 2009)).

[98] *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *6 (Del. Ch. Aug. 25, 2006) (quoting *Gildor v. Optical Sols., Inc.*, 2006 WL 1596678, at *7 n.17 (Del. Ch. June 5, 2006)).

[99] *Related Westpac*, 2010 WL 2929708, at *6.

unreasonably withheld'[100] standard demonstrates" it could withhold consent because of its "own commercial interests."[101]

PE Member acted reasonably and nonarbitrarily in withholding consent to the loan modification documents before July 17, and did not deprive Common Member the benefit of its bargain. PE Member withheld consent because it was concerned the April modifications would cure only the June 2023 and September 2023 defaults,[102] and not the additional Defaults at issue based on December 2023 and March 2024 testing. PE Member was also concerned that the Company would fail the DSCR and IODSCR covenants even as modified, due to the Property's performance and the covenant's long lookback period.[103] And on June 11, ONB confirmed PE Member's qualms: only the earlier defaults would be waived, and future defaults could still occur under the proposed amendments.[104] PE Member's fears were not unreasonable or arbitrary reasons to withhold consent.

Common Member claims that PE Member unreasonably withheld consent because PE Member believed Common Member was mismanaging the Company

---

[100] *E.g.*, OA § 9.1(i).

[101] *Related Westpac*, 2010 WL 2929708, at *6; *see also Superior Vision*, 2006 WL 2521426 at *6.

[102] *See* JX 373 at 3.

[103] Kavourias Tr. 47; Detzler Tr. 156–57.

[104] JX 395 at 2–3.

and wanted to take control.[105]  It is true that on July 25, PE Member stated it would provide consent to certain loan amendments if it could take control of the Company.[106]  That condition on PE Member's consent is arguably arbitrary.  But PE Member imposed that condition on July 25, after the cure period ended on July 17.  The Operating Agreement gave PE Member the right to terminate control once the cure period expired without a cure.[107]  PE Member's extra "horse-trading"[108] after the cure period cannot inform my consideration of PE Member's refusal to give consent during the cure period.

On July 30, PE Member effectuated a change in control.  Despite this, Common Member has not facilitated a change in control.  Common Member must cooperate in good faith with the transition in management to PE Member.[109]

### B.      Further Relief Is Not Warranted At This Time.

PE Member requests a broad declaration that all acts taken by Common

---

[105] PTAB 30–32.

[106] JX 417 at 3.

[107] OA § 7.2(b); *Fetch Interactive Television LLC v. Touchstream Techs. Inc.*, 2019 WL 193921, at *21 (Del. Ch. Jan. 15, 2019) ("I find that Shodogg gave FetchIT the contractually required cure period of fifteen days, FetchIT did not cure its breach within this time, and Shodogg's termination of the License Agreement was therefore contractually proper.").

[108] JX 417 at 3.

[109] OA § 7.3.

Member after it was terminated as managing member are void unless ratified.[110] PE Member states it "is currently the proper Managing Member of the Company and any action taken by the Company after the change in control is void and of no legal effect."[111] PE Member has not pointed to any specific action or set of actions. It is true that PE Member properly took control on July 30, but it would be reckless to categorically void every single action taken by the Company in the past four months without knowing what those actions are, and whether Common Member could have accomplished them without managing member status. If PE Member is concerned about certain decisions or actions, it can request, with support, tailored relief.

PE Member requests attorneys' fees. "Delaware courts generally apply the American Rule, under which 'each party is obligated to pay its own attorneys' fees regardless of the outcome.'"[112] But there are exceptions to the American Rule. "For one, '[a] fee-shifting provision in an enforceable contract provides a clear exception to the default American Rule.'"[113] PE Member states it is entitled to fees under

---

[110] PTOB 64–65; D.I. 43 ¶ 93.

[111] PTOB 64.

[112] *Sparton Corp. v. O'Neil*, 2018 WL 3025470, at *5 (Del. Ch. June 18, 2018) (quoting *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC,* 2009 WL 458779, at *8 (Del. Ch. Feb. 23, 2009)).

[113] *Avgiris Bros., LLC v. Bouikidis*, 2023 WL 7137104, at *2 (Del. Ch. Oct. 31, 2023) (quoting *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 2020 WL 4596838, at *4 (Del. Ch. Aug. 11, 2020), *aff'd*, 261 A.3d 1199 (Del. 2021)).

relevant provisions of the Operating Agreement and guaranty agreement.[114] The

relevant provisions appear to support PE Member's request.[115]

But PE Member's request is premature. Seven more counts remain to be

resolved, including a breach of contract claim against Defendants for breaches of the

Operating Agreement's change in control provisions, and Common Member's

counterclaims. "This Court's power to award interim fees 'is part of the original

authority of the chancellor to do equity in a particular situation.'"[116] But

"[p]iecemeal requests for attorneys fees are not favored, and for good reason."[117]

Typically, interim fees "are awarded only in cases where a particular exigency or

other special circumstance exists."[118] "[I]nterim fee awards may be appropriate

---

[114] PTOB at 64–65.

Common Member also requests fees and costs on that grounds that PE Member acted in bad faith in their relationship outside the courtroom. PTAB 60. The bad faith exception to the American Rule may apply if a party's underlying fraudulent conduct causes the litigation, but that is a "quite narrow exception [that] is applied in only the most egregious instances of fraud or overreaching." *Arbitrium (Cayman Islands) Handels AG v. Johnston*, 705 A.2d 225, 231 (Del. Ch. 1997), *aff'd*, *720* A.2d 542 (Del. 1998). Common Member did not support its request for fees with any evidence showcasing such egregious conduct. I deny its request.

[115] JX 154 § 2.2 (requiring PE Member successfully litigate its claims); OA § 17.4 (shifting fees, including in litigation concerning a change in control, to the Company).

[116] *Sparton Corp.*, 2018 WL 3025470, at *5 (quoting *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 393 (1970)).

[117] *In re Emulex S'holder Litig.,* C.A. 4536-VCS (Del. Ch. Dec. 18, 2009) (ORDER) ("Efficiency concerns suggest that, absent some exigency, requests for fees all be heard one time at the end of a case.").

[118] *Smollar v. Potarazu*, 2016 WL 3635304, at *1 (Del. Ch. June 29, 2016).

25

where the plaintiff has achieved the benefit sought by the claim that has been mooted or settled and that benefit is not subject to reversal or alteration as the remaining portion of the litigation proceeds,"[119] or if a contract "carves out claims that the Court has already dismissed and that are not subject to reversal or alteration by the remaining litigation."[120] "By contrast, if further litigation could alter the nature or scope of the relief obtained, or if there are reasons why benefits cannot yet be evaluated, then an interim award would be premature."[121]

PE Member has not demonstrated exigency or other special circumstances. Both agreements provide PE Member entitlement to fees in litigation concerning the Operating Agreement. To the extent the feeshifting provisions provide an entitlement to fees based on the change in control provisions, there is a remaining breach of contract claim related to PE Member's change in control.[122] Because PE Member brought other claims, and Common Member has pending counterclaims, I find PE Member's request premature.[123]

---

[119] *La. State Employees' Ret. Sys. v. Citrix Sys., Inc.*, 2001 WL 1131364, at *4 (Del. Ch. Sept. 19, 2001).

[120] *Sparton Corp.*, 2018 WL 3025470, at *5.

[121] *Id.* (quoting *In re Del Monte Foods Co. S'holders Litig.*, 2011 WL 2535256, at *7 (Del. Ch. June 27, 2011)).

[122] D.I. 43 ¶¶ 96–99.

[123] "Regardless of whether a party can satisfy the requirements for an interim fee award, the decision to entertain the application remains at the discretion of the trial court." *In re Del Monte*, 2011 WL 2535256, at *7.

## III.  CONCLUSION

Judgment for PE Member on Count I is entered in part and denied in part.  The parties should submit a stipulated proposed implementing order within twenty days, and a stipulated proposed scheduling order for the remainder of the case at a time of their choosing.